**PENN MUTUAL LIFE INSURANCE COMPANY**

v.

**Frederick B. ABRAMSON, et al.**

No. 86–1735.

District of Columbia Court of Appeals.

Argued March 13, 1987.
Decided Sept. 15, 1987.

Michael F. Curtin, Washington, D.C., guardian ad litem, for Daria L. Ibn-Tamas.

Robert P. Stranahan, Jr., Washington, D.C., guardian ad litem, for Adam Y. Ibn-Tamas.

Before MACK and BELSON, Associate Judges, and NEBEKER,[*] Associate Judge, Retired.

NEBEKER, Associate Judge, Retired:

This opinion results from a question of law certified to this court by the United States Court of Appeals for the District of Columbia Circuit pursuant to D.C.Code § 11–723 (1987 Supp.). We have been asked by that court to determine under District of Columbia law whether the life insurance policy of Abdur Rahman Y. Ibn-Tamas (the insured) may be reformed to designate as a beneficiary the insured's son, Adam Y. Ibn-Tamas, who was born to the insured's second wife five months after his death in February 1976. For the reasons discussed below, it is our view that the life insurance policy may not be re-formed to benefit the insured's after-born son.

## I.

As set forth in its certification memorandum, the court of appeals has deemed the following facts relevant to the question of law certified to this court:

Abdur Ibn-Tamas, the insured, purchased the life insurance policy in question in 1974 after he had divorced his first wife and remarried. At the time the insured purchased the policy, he had two children from his first marriage and one child from his second marriage. He designated his second wife, Beverly Ann Ibn-Tamas, as beneficiary of all proceeds payable under the policy provided she survived him; otherwise, one half of the proceeds was to be paid in equal shares to Robert Gamble and Tamara Gamble, the two children of the insured's first marriage, and the remaining one half was to be paid to Daria Ibn-Tamas, the daughter of the insured's second marriage.

The precise terms of the policy pertaining to beneficiary designation are set out below.

### BENEFICIARY OF ANY BENEFIT PAYABLE BY REASON OF INSURED'S DEATH

The proceeds of the policy, or the combined proceeds of all policies numbered above if more than one, payable by reason of the death of the Insured shall be paid as provided below and in the following General Provisions.

The proceeds shall be paid in one sum to BEVERLY ANN IBN–TAMAS, wife of the insured, if she survives the insured, otherwise in one sum as follows:

(a) As to ½ of the proceeds:

To DARIA IBN–TAMAS, daughter of the insured, if she survives the insured, otherwise to the executors or administrators of the insured.

(b) As to the remaining ½ of the proceeds:

---

[*] Judge Nebeker was an Associate Judge of this court at the time of argument. His status changed to Associate Judge, Retired, on September 1, 1987.

In equal shares to such of ROBERT GAMBLE and TAMARA GAMBLE, children of the insured, who survive the insured, if any, otherwise to the executors or administrators of the insured.

Payment(s) becoming due a child while a minor shall be paid to ERNEST G. HAMMOND, of 2514 N.W., Longwood Avenue, Baltimore, Maryland, as Trustee, to be used for the support, education and welfare of such child and to pay over to such child upon attaining legal age or to his personal representative upon earlier death, any balance then retained by the Trustee. The Trustee shall have the power while such child is a minor to exercise for the same purposes any privileges available to such child.

If the proceeds payable upon the death of the Insured are not completely distributed by payments as directed on the reverse side, any balance shall be paid to the executors or administrators of the Insured.[1]

The policy also contained a requirement that a change of beneficiary be effected in writing. This provision reads as follows.

*Change of Owner and Beneficiary*—The owner or beneficiary may be changed by filing a written designation at the Home Office in form acceptable to the Company. No owner or beneficiary designation shall be effective until so filed but when so filed shall take effect as of the date it was made, subject to any action taken by the Company before its receipt at the Home Office.

The policy thus designated all beneficiaries by name and provided, with respect to proceeds due a minor child, for administration of the funds by a trustee for the child's support, education and welfare.

In February 1976, the insured was murdered by his second wife, who, five months later, gave birth to the insured's fourth child, Adam Ibn-Tamas, the second child of his second marriage. Under D.C.Code § 19–320 (1981), the second wife, having been convicted of second-degree murder for the death of the insured, is ineligible to receive the proceeds of the insurance policy of which she had been designated the primary beneficiary.[2] The insurer, Penn Mutual Life Insurance Company, has paid the proceeds, of about $70,000, into the registry of the United States District Court for the District of Columbia; by an order of that court, half of the sum so paid has been distributed in equal shares to Robert and Tamara Gamble, the children of the insured's first marriage, whose interests were unaffected by the instant dispute over the remaining half share designated in the policy for Daria Ibn-Tamas.

The question of law certified to this court by the court of appeals is this: "Under District of Columbia law, and given the undisputed facts described [above], how should the proceeds of a life insurance policy be distributed among children of the deceased insured?" As to this question, the court of appeals in its certification memorandum states the "sole and dispositive issue in this cause" to be whether (1) as the guardian *ad litem* for Daria Ibn-Tamas (first child of the second marriage) contends, that child is entitled to the entire balance of the funds on deposit in the district court's registry, or (2) as the guardian *ad litem* for Adam Ibn-Tamas (second child of the second marriage, born after the insured's death) contends, and as the district court held, the insurance policy should be reformed to designate Adam as a beneficiary, entitled to share equally with Daria the currently undistributed policy proceeds.

We note that this question arose in an interpleader action in the United States

---

1. A copy of the insurance policy and other material were submitted to this court in the form of excerpts from the record in the certifying court. It seems that this provision of the policy referring to "the reverse side," appears in the original policy on the backside of the page containing the other beneficiary provisions.

2. Section 19–320(a) provides in part that "[t]he estate, interest, or property to which the person so convicted [of murder or manslaughter] would have succeeded or would have taken in any way from or after the death of the decedent

goes, instead, as if the person so convicted had died before the decedent." This section bars one convicted of second-degree murder from receiving proceeds of life insurance policy procured by the person murdered. *See Napoleon v. Heard*, 455 A.2d 901, 902–03 (D.C.1983). Because in this case Beverly Ann Ibn-Tamas is deemed under the statute to have pre-deceased her husband, the proceeds of the policy, in accordance with his designation, vest in the beneficiary children.

District Court instituted by Penn Mutual for an order governing distribution of the proceeds. Finding no material fact in dispute, the district court held as a matter of law that the insurance policy should be reformed to include Adam as a beneficiary.[3] The district court reasoned that the insurance policy established a trust fund for the insured's named children and that reformation of the trust to include the after-born child was appropriate to give effect to the insured's intent. In divining such intent, the district court, among other things, looked to evidence that the insured met with his children's trustee the day before he was murdered, expressed excitement over the prospect of Adam's birth, and informed the trustee of his "plans to provide for all four children, including insurance." The court also noted that statements in the record made by the insured's second wife supported the trustee's view that the insured "intended to provide for his unborn son and would have wanted his son to share equally with the other children in the proceeds of this policy." The guardian *ad litem* for Daria Ibn-Tamas noted an appeal which is now being held in abeyance pending this court's answer to the certified question.

## II.

The legal issue presented is one of first impression in this jurisdiction and one appropriate for certification in accordance with the statutory authority contained in D.C.Code § 11–723. Inasmuch as this is our first occasion to answer a certified question, we begin with some observations about the process.

Our certification statute was enacted by the Congress of the United States as part of the District of Columbia Judicial Efficiency and Improvement Act of 1986, Pub.L. No. 99–573, § 7, 1986 U.S.CODE CONG. & AD.NEWS (100 Stat. 3228) 10A. The Act was signed into law by the President on October 28, 1986, with § 7, codified at D.C.Code § 11–723, becoming effective that day. Section 11–723 was implemented to conform District law with the Uniform Certification of Questions of Law Act, 12 U.L.A. 52 (1975). *See* S.REP. No. 477, 99th Cong., 2d Sess. 5 (1986); Annual Report of the District of Columbia Delegation to the National Conference of Commissioners on Uniform State Laws, 115 Daily Wash.L. Rptr. 1057, 1060 (May 22, 1987).[4] It provides this court with jurisdiction to answer questions of law of the District of Columbia which may be determinative of the cause pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in our decisions. D.C.Code § 11–723(a).[5] As

---

**3.** The district court's memorandum decision of December 12, 1985, was appended to the court of appeals' certification memorandum.

**4.** *See* the Annual Report of the D.C. Delegation for a condensed legislative history of the D.C. Judicial Efficiency and Improvement Act of 1986.

**5.** Section 11–723 provides in its entirety as follows.

*Certification of Questions of Law.*

(a) The District of Columbia Court of Appeals may answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, or the highest appellate court of any State, if there are involved in any proceeding before any such certifying court questions of law of the District of Columbia which may be determinative of the cause pending in such certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the District of Columbia Court of Appeals.

(b) This section may be invoked by an order of any of the courts referred to in subsection (a) upon the court's motion or upon motion of any party to the cause.

(c) A certification order shall set forth (1) the question of law to be answered; and (2) a statement of all facts relevant to the question certified and the nature of the controversy in which the questions arose.

(d) A certification order shall be prepared by the certifying court and forwarded to the District of Columbia Court of Appeals. The District of Columbia of Appeals may require the original or copies of all or such portion of the record before the certifying court as are considered necessary to a determination of the questions certified to it.

(e) Fees and costs shall be the same as in appeals docketed before the District of Columbia Court of Appeals and shall be equally divided between the parties unless precluded by statute or by order of the certifying court.

(f) The District of Columbia Court of Appeals may prescribe the rules of procedure

prescribed in the statute, this court may entertain certified questions only from the Supreme Court, federal courts of appeals, or the highest appellate court of any state. *Id.* Section 11–723 further establishes, *inter alia,* the procedures by which the certifying court may invoke certification and by which this court may respond to such a request.[6]

One feature of § 11–723 which bears emphasis is the permissive language found in subsection (a) respecting the authority of this court to answer questions certified to it. Just as we "may" answer a question of law properly certified, we may decline to do so sua sponte or on motion of a party. *See* S.REP. NO. 477, *supra* (court has discretion to act on a certified question); Uniform Certification of Questions of Law Act, *supra,* § 1 Commissioners' comment at 52 (same). Thus, for example, if in our view the question of local law which perplexed the certifying court would in no way be "determinative of the cause" within the meaning of § 11–723(a), we might refuse to answer the question. *See generally* 17 C. WRIGHT, A. MILLER, & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4248, at 527–28 (1978). And in an appropriate case we may, of course, decline certification where either the certifying court or a party fails to comply with the procedural requirements of § 11–723 or the rules of this court. See notes 5 & 6, *supra.*

Nonetheless, we recognize that certification is an efficacious means by which concerned courts are able to have firmly resolved doubtful questions of state law. And implementation of the certification process where permitted has been viewed approvingly by the Supreme Court, as well as by many other courts and commentators. *See, e.g., Bellotti v. Baird,* 428 U.S. 132, 150–51, 96 S.Ct. 2857, 2868, 49 L.Ed.2d 844 (1976) (certification " 'does, of course, in the long run save time, energy, and resources and helps build a cooperative judicial federalism' "—quoting *Lehman Brothers v. Schein,* 416 U.S. 386, 391, 94 S.Ct. 1741, 1744, 40 L.Ed.2d 215 (1974)); *Lee v. Wheeler,* 258 U.S.App.D.C. 184, 187, 810 F.2d 303, 306 (1987) (by employing Maryland's certification procedure, "we can avoid the hazards of attempting to forecast how the Maryland courts might rule"); Lillich & Mundy, *Federal Court Certification of Doubtful State Law Questions,* 18 UCLA L.REV. 888 (1971). Moreover, while much of what might be gained from certification pursuant to our statute will be realized by the certifying court, the process will undoubtedly serve local interests as well. If nothing else, certification will afford this court an opportunity to address an open and not insubstantial issue arising under District of Columbia law. *See Lee v. Wheeler, supra,* 258 U.S.App.D.C. at 187, 810 F.2d at 306.[7] Hence, our discretion to answer on certification will be exercised in a spirit of comity and respect for the other courts. We are also certain that certifying courts will be selective so that only ques-

concerning the answering and certification of questions of law, under this section.

(g) The written opinion of the District of Columbia Court of Appeals stating the law governing any questions certified under subsection (a) shall be sent by the clerk to the certifying court and to the parties.

(h)(1) The District of Columbia Court of Appeals, on its own motion or the motion of any party, may order certification of questions of law to the highest court of any State under the conditions described in subsection (a).

(2) The procedures for certification from the District of Columbia to a State shall be those provided in the laws of that State.

We note that in the instant case, the court of appeals complied with the statutory procedures for certification contained in this section.

6. Section 11–723(f) permits this court to prescribe rules of procedure concerning the answering and certification of questions of law. Our rules on certification have not yet been promulgated, but they have been published for comment and action on them is expected in the near future. We note that where apropriate, as here, matters on certification will be set for oral argument before the division of this court which has been assigned to the case. Also, a question certified will be deemed decided twenty-one days after our decision is filed. But a party may timely petition for rehearing or rehearing en banc in accordance with our rules.

7. Of course, we do have an interest in seeing that District of Columbia law is applied harmoniously in local and foreign courts. The certification process may prevent the disparate treatment of local issues as they arise in this and other jurisdictions.

tions which are truly appropriate for certification come to this court via that process. *See* 1A–Pt. 2 J. MOORE, W. TAGGART, A. VESTAL, & J. WICKER, MOORE'S FEDERAL PRACTICE ¶ 0.203[5], at 2159–62 (1985).

■ We also recognize that the significance of an opinion from this court on a certified question, at least in terms of its impact on local law, depends greatly on whether the opinion constitutes binding precedent in this jurisdiction. *See generally M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971). In our view, such an opinion, though in one sense advisory, is *stare decisis* of this court, as well as *res judicata* as to subsequent litigation between the same parties in local courts. *See In re Elliot*, 74 Wash.2d 600, 610–11, 446 P.2d 347, 354 (1968); *In re Richards*, 223 A.2d 827, 832 (Me.1966). *See also* Note, *Certification Statutes: Engineering a Solution to Pullman Abstention Delay*, 59 NOTRE DAME L.REV. 1339, 1355–56 (1984); Lillich & Mundy, *supra*, 18 UCLA L.REV. at 903–05; 17 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE, *supra*, at 532.

Another important concern is this court's scope of review in matters certified to it pursuant to § 11–723. For that matter, there is a question whether "review" is even a proper function here. As provided in subsection (a) of the statute, our authority on certification is limited to answering "questions of law" put to us by the certifying court. To that end, the certifying court is required to set forth in its certification order the question(s) of law to be answered, as well as "a statement of all facts relevant to the questions certified and the nature of the controversy in which the questions arose." D.C.Code § 11–723(c), *supra* note 5. However, the statute does not say whether this court is confined in its analysis to the legal issues as articulated by the certifying court. Nor does it prescribe how we are to review the certifying court's statement of facts in conjunction with the issues presented and all other material of record. *Compare* D.C.Code § 17–305(a) (1981) (prescribing this court's scope of review as to matters of fact and law in appeals from the Superior Court).

Moreover, as these correlative concerns call to attention, the statute does not inform us how to proceed if and when our view of the issues and pertinent facts in a case differs from the view of the certifying court expressed in its certification order.

■ With regard to the questions of law designated by the certifying court, we may exercise our prerogative to frame the basic issues as we see fit for an informed decision. Although the statute contains language which seemingly constrains this court to answer the questions as certified, *see* §§ 11–723(a), (c), (d), and (g), *supra* note 5, similar statutes have not precluded other courts from permitting such reformulation of the issues as is necessary. *See, e.g., Meckert v. Transamerica Insurance Company*, 742 F.2d 505, 507 (9th Cir.1984); *Kelley v. Integon Indemnity Corporation*, 726 F.2d 1519, 1521 (11th Cir.1984). Common sense also militates in favor of allowing reformulation of the issues where required. The certifying court, presumably being less familiar with District of Columbia law than this court, conceivably might misstate or overlook a dispositive state law issue. Thus, we will adhere to the commonly held rule permitting latitude in the consideration of nondesignated questions and the reformulation, if necessary, of those questions as certified. *See* 17 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE, *supra*, at 531–32, and citations therein.

■ Nor, in our view, must we confine our analysis to the certifying court's "statement of all facts relevant to the questions certified." D.C.Code § 11–723(c), *supra* note 5. The requirement of § 11–723(c) that such a statement be submitted is designed to ensure that this court has "a complete picture of the controversy so that the answer will not be given in a vacuum." Uniform Certification of Questions of Law Act, *supra*, § 3 Commissioners' comment at 53. Consistent with this purpose, the certifying court may (and did here) "include exhibits, excerpts from the record, summary of the facts found by the court, and any other document which will be of assistance to the answering court."

*Id.* On the other hand, this court, with the same purpose in mind, "may require the original or copies of all or such portion of the record before the certifying court as are considered necessary to a determination of the questions certified to it." § 11–723(d), *supra* note 5. Therefore, while the statement of facts required from the certifying court may prove helpful to our analysis on the merits or, indeed, be on its face determinative of the issues, we are not bound by the statement. Rather, we may consider as necessary whatever is contained in the record transmitted on certification, as well as the entire record before the certifying court.[8]

As to our scope of review, then, certified questions of law may in certain respects be dealt with like issues which arise in cases on direct appeal: this court is neither bound by the issues as framed for our review, nor precluded from considering the facts which have been presented as relevant to these issues in context with the entire appellate record. We recognize, however, that with respect to cases on direct appeal, § 17–305(a), *supra*, specifically defines our scope of review: when the issues of fact were tried by a jury, we may review the case only as to matters of law; and when the case was tried without a jury, we may review both as to the facts and the law, "but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." Yet, our certification statute, unlike § 17–305(a) and the cases interpreting that code section, does not inform us how to regard the facts of record when addressing the questions certified. Thus, for example, if we were to discover that the answer to a certified question turned on specific findings of fact by the trial court, which were or were not reflected in the certifying court's factual statement, we would be left to guess whether to apply a "plainly wrong" standard to the findings such as that prescribed in § 17–305(a). And this matter is compli-

cated somewhat by the fact that our consideration of questions of law through the certification process is accomplished from a different perspective. Our jurisdiction extends to answering questions of law from the certifying court. Obviously, we have no authority to set aside a judgment of a trial court subordinate to the certifying court.

■ Of course, it is not our place to fill whatever gaps in § 11–723 might foreseeably be an impediment to future certifications. Questions certified to this court could originate from trial court orders or judgments in any one of a number of different settings. Moreover, it is conceivable that we could be faced with a legal question on certification which does not require us to review the trial proceedings at all, such as where the issue turns solely on undisputed facts admitted by stipulation of the parties. *See* 1A–Pt. 2 J. MOORE, MOORE'S FEDERAL PRACTICE, *supra*, at 2162. Nevertheless, as a general rule and one applicable to the instant case, we think it is appropriate to review certified questions of District of Columbia law in the same manner, and with the same limitations, as questions presented to us on direct appeal. Hence, among other things, our usual deference will be shown to a jury's verdict or to the factual findings of a trial court sitting without a jury. So we will, to the extent possible, apply § 17–305(a) on certified questions.

### III.

The procedural posture of this case in the proceedings before the United States District Court is somewhat unclear. The record now before us reveals that the insurer, Penn Mutual, filed a "Complaint for Interpleader" in the district court on the jurisdictional authority of 28 U.S.C. § 1335 (1982). In its complaint, the insurer prayed for relief in the nature of an order discharging it from liability on the policy, the proceeds of which had already been deposited in the court registry. The insurer also

---

8. This is not to say the statement of facts from the certifying court will serve no purpose. The statement initially will guide us in deciding whether to answer the question certified. *Cf. Richards, supra,* 223 A.2d at 833. Further, the

statement may well state completely the facts pertaining to the questions certified—as where, for example, the evidence was stipulated in the certifying court—and thereby obviate our recourse to other materials of record.

sought the appointment of guardians *ad litem* to represent the three named beneficiary children and the insured's after-born son. Answers were subsequently filed by the executor of the insured's estate and the children's trustee designated in the policy, both of whom were among those named as defendants in the action. The present guardians *ad litem* for Daria and Adam Ibn-Tamas (the insured's daughter by his second wife and after-born son, respectively) were appointed sometime thereafter.

As indicated in the district court's memorandum decision,[9] the guardians at some point filed "extensive memoranda of fact and law" on the issue raised in the interpleader action, *viz.*, Adam's entitlement to a share of the insurance proceeds. The district court also had before it, *inter alia*, a copy of the insurance policy, an affidavit of the children's trustee, and a letter from the insured's second wife who was then incarcerated in a federal prison. The trustee's affidavit and the wife's letter essentially professed that the insured would have wanted Adam to be included as a beneficiary of the proceeds. In ruling as it did in favor of Adam, the district court relied exclusively on these submissions, "finding no material facts in dispute ... [and] determin[ing] that further briefing and discovery [were] not necessary." There was no hearing or trial conducted on the pleadings.

It appears these proceedings before the district court were in the nature of an action for a declaratory judgment. However, neither the federal rule on interpleaders, FED.R.CIV.P. 22, nor the statutes pertaining thereto, 28 U.S.C. §§ 1335, 1397, & 2361 (1982), help us in determining what occurred here. The statutes refer simply to "civil actions" of interpleader, whereas the rule treats only the use of interpleaders to protect against a party's double or multi-ple liability on the basis of an action already maintained. Nonetheless, the relief sought by each party in this case, as well as the relief actually obtained for Adam, was consistent with that permitted under the federal rule and statute governing declaratory judgments. *See* 28 U.S.C. § 2201 (1982); FED.R.CIV.P. 57. *See also* Form 18, FED.R.CIV.P.APP. OF FORMS ("Complaint for Interpleader and Declaratory Relief"); *New York Life Insurance Co. v. Baum*, 617 F.2d 1201 (5th Cir.1980) (action for interpleader and declaratory judgment).[10]

It appears further that the declaratory decision of the district court was in effect a grant of summary judgment, rather than what could conceivably be construed as a judgment following a nonjury trial on stipulated facts. Summary judgment is permitted under FED.R.CIV.P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." While the record before us does not reveal whether any party formally moved for summary judgment, and neither the district court's memorandum decision nor order states that "summary judgment" was granted, the memorandum decision contains language consistent with decision pursuant to Rule 56(c). And actions for declaratory relief frequently are resolved in summary proceedings. *See* FED.R.CIV.P. 57 advisory committee note. Finally, in stating in its memorandum decision that no further briefing and discovery were necessary, the district court seemingly ruled out any sort of disposition by trial.[11]

Therefore, and in accordance with our discussion above in part II, we shall treat this certification in the posture of an appeal from the trial court's grant of declaratory

9. See note 3, *supra.*

10. The district court's memorandum decision was accompanied by an order which "amended" the insurance policy to designate Adam as a beneficiary.

11. We note also that the parties appear to have been content to have the district court summarily decide the case. No issue respecting the posture of the proceedings before the district court was raised on direct appeal.

relief on cross-motions for summary judgment. *Cf. New York Life Insurance Co. v. Baum, supra* (review of summary judgment grant on cross-motion for summary judgment in action for interpleader and declaratory relief). Our scope of review in this area is well established. We will review the record and determine whether the trial court erred in concluding that there is no genuine issue as to any material fact and that the moving party (whose cross-motion prevailed here) is entitled to a judgment as a matter of law. *See, e.g., Brown v. General Motors Acceptance Corp.,* 490 A.2d 1125, 1126 (D.C.1985); *Holland v. Hannan,* 456 A.2d 807, 814 (D.C.1983).

### IV.

The parties are in agreement here, as they apparently were in the district court and on appeal, that there are no genuine issues of fact material to the questions involved in this case. Our review of the record transmitted by the certifying court, including the statement of facts it submitted pursuant to § 11–723(c), confirms the absence of a material factual dispute. The undisputed material facts are basically those contained in the certifying court's statement of facts which we related in part I, *supra.* Additional facts not specifically found in this statement, but which nonetheless bear on the issues, are reflected in the district court's memorandum decision. These facts pertain to the professed intent of the insured to provide for Adam generally and the claim that the insured would have wanted him to share equally in the proceeds of the insurance policy.[12] In any event, we think the record as transmitted by the certifying court is sufficient from a factual standpoint for us to resolve the legal issues.

We turn now to the question whether Adam was entitled to a judgment in his favor as a matter of District of Columbia law. As mentioned above, we have been asked generally to determine how the proceeds of the life insurance policy should be distributed among the insured's children. The certifying court of appeals views the dispositive issue in this regard to be specifi-

cally whether Daria Ibn-Tamas is entitled to the entire balance of the funds on deposit in the district court's registry or, as the district court held, the insurance policy should be reformed to designate Adam as a beneficiary, entitled to share equally with Daria the undistributed proceeds. On the record before us, this boils down to the question whether the policy may be reformed on the evidence which the district court considered. In our view, Daria is entitled as a matter of law to the entire balance of the proceeds. We respectfully disagree with the district court's analysis and holding.

Leaving aside for a moment the issue whether Adam can benefit from the trust created in the insurance policy, we start by recognizing the established rule that "[a]n insurance policy as issued and accepted is prima facie the contract of the parties." 13A J. APPLEMAN & J. APPLEMAN, INSURANCE LAW AND PRACTICE § 7608, at 304 (1976). Daria first contends, on this basis, that the district court erred in ordering reformation of the beneficiary designation because there was no proof of a mutual mistake respecting the designation by those who entered into the contract. Her argument proceeds on the legal theory that absent fraud or negligence by the insurer, proof of a mutual mistake is required for reformation of an insurance contract so as to effectuate the real agreement and intention of the parties. *See id.* § 7609, at 316–19. She relies heavily on *Urquhart v. Alexander and Alexander, Inc.,* 218 Md. 405, 411, 147 A.2d 213, 217 (1958), where it was stated that

> [t]he reformation of an insurance contract cannot be decreed in the absence of proof of a mutual mistake. It is elementary that a contract may be reformed when it is shown by competent evidence that a mutual mistake did in fact occur. In this respect a contract of insurance is not different from any other contract and may be reformed, even after the death of the insured, to correct a mistake in the name of the beneficiary and thereby effectuate the intention of the parties.

12. Copies of this evidence, which consists of the trustee's affidavit and the wife's letter, are appended to the brief of guardian *ad litem* for Adam Ibn-Tamas.

However, when the rules of law governing the reformation of an insurance policy to correct a mistake are to be applied, a proper case must be presented. Specifically, to justify the reformation, it must be shown by satisfactory proof that a valid policy exists and that, by reason of the mutual mistake on the part of both parties to the contract, the policy does not conform to the actual agreement made by the parties. [Citations omitted.]

*See also* 13A J. APPLEMAN, INSURANCE LAW AND PRACTICE § 7608, *supra*, at 305–08. *Cf. Max Holtzman, Inc. v. K & T Company*, 375 A.2d 510, 513–14 (D.C.1977).

■ We view this as an accurate statement of the law on the reformation of insurance contracts. It is appropriately applied in instances where it has been alleged that, because of mistake, the policy as written does not embody a term or terms actually agreed upon by the contracting parties. Thus, with satisfactory proof that but for mutual mistake a life insurance policy would have designated a different or additional beneficiary, the policy may be reformed in order to reflect what was actually agreed upon.

■ Clearly, the contracting parties in this case, the deceased insured and Penn Mutual, did not omit Adam from the beneficiary clause of the policy because of mutual mistake. Adam had not been conceived at the time the contract was entered. And there is no evidence to suggest, nor a claim made here that the parties agreed upon a specific term to cover after-born children, but mistakenly left such a term out of the policy. Therefore, as Daria correctly points out, there is no foundation for any reformation of the policy on a theory of mutual mistake.

Nor do we believe this case is appropriate for application of the equitable doctrine which recognizes as legally sufficient an insured's substantial compliance with the policy's change-of-beneficiary requirements.

The majority rule is to the effect that if the insured has done everything in his power to effect a change of beneficiary but dies before the last act is completed, particularly when the remaining acts are ministerial ones to be performed by the insurer, the change will be regarded as complete and the new beneficiary will take the proceeds.

2A J. APPLEMAN, INSURANCE LAW AND PRACTICE § 1021, *supra*, at 33 (footnote omitted). "The courts following this liberal view hold that any mode of change which properly expresses the insured's intention is adequate." *Id.* at 36 (footnote omitted).

■ This court has not had occasion to pass on the substantial compliance doctrine as it is applied in the insurance setting that we have here. Nevertheless, as the law of this jurisdiction presently stands, for a change-of-beneficiary designation to be effective, if not strictly in compliance with the terms of the policy, it must be evidenced in some form of writing. *Cohn v. Cohn*, 84 U.S.App.D.C. 218, 171 F.2d 828 (1948), *cert. denied*, 336 U.S. 962, 69 S.Ct. 892, 93 L.Ed. 1114 (1949). In *Cohn*, the United States Court of Appeals for the District of Columbia Circuit (the certifying court in the instant case) reached such a conclusion in rejecting the claim of a deceased naval officer's wife to the proceeds of his wartime National Service Life Insurance policy. The parents of the insured officer were the named beneficiaries on the policy, but the officer's wife claimed that by a change she had been named in their place. In face of some evidence that the policy had been changed to benefit the wife, but not a writing, the court of appeals held that the evidence was insufficient:

All these circumstances create an atmosphere which illustrates the necessity that any change in the formally designated beneficiaries of these policies be evidenced by some unmistakable proof that the decedent did actually make the change. The reasonable and, in our view, necessary proof is a writing, which, if not currently existing, should be proved by the well-established rules for making such proof.

*Id.* at 220, 171 F.2d at 830. *See Farmakis v. Farmakis*, 84 U.S.App.D.C. 297, 172 F.2d 291 (applying the rule of *Cohn*), *cert. denied*, 337 U.S. 958, 69 S.Ct. 1535, 93 L.Ed. 1757 (1949).

Since *Cohn* was decided prior to District of Columbia court reorganization (February 1, 1971), it constitutes binding precedent on this division. *See M.A.P. v. Ryan, supra.* We recognize that *Cohn* interpreted a subject of federal regulation. 84 U.S. App.D.C. at 219 n. 3, 171 F.2d at 829 n. 3. But its facts cannot be meaningfully distinguished from those present in this case. The Penn Mutual policy at issue here (quoted *supra*) contains no less exacting a requirement that the change of beneficiary designation be accomplished in writing. Moreover, the minimum requirement of a writing was sustained in *Cohn* despite the liberal interpretation given the regulation because of the difficult circumstances under which servicemen ordinarily transacted their business affairs during the war. *See Farmakis, supra,* 84 U.S.App.D.C. at 298, 172 F.2d at 292.

■ But looking past *Cohn,* Adam's claim would fail under even the most permissive test of what constitutes substantial compliance. The insurance contract unequivocally requires that any beneficiary change be made "by filing a written designation at the Home Office in form acceptable to the Company." The evidence suggesting a change was attempted by the insured here consists solely of the trustee's vague assertion that the insured expressed his intent "to provide for the college education of all four children, including savings, investments, and insurance as part of his financial plans." Only on pure speculation could one divine from this reference to insurance the insured's intent to file a change of beneficiary form adding Adam to the Penn Mutual policy. Moreover, according to the trustee, the insured "did not say that he intended to change this policy to add on an unborn child." In any event, the mere oral expression of an intent to designate different or additional beneficiaries, without evidence of affirmative steps taken to effect the change, has been held not to amount to substantial compliance. *See, e.g., Ferguson v. Knight,* 264 F.2d 176, 179 (5th Cir.1959); *Bradley v. United States,* 143 F.2d 573, 576 (10th Cir.1944), *cert. denied,* 323 U.S. 793, 65 S.Ct. 429, 89 L.Ed. 632 (1945); *Urquhart v. Alexander and*

*Alexander, Inc., supra,* 218 Md. at 412–16, 147 A.2d at 218–19. We find that reasoning sound in answering this certified question.

■ The district court employed a different analysis. As we mentioned earlier, the court reformed the trust created in the policy in order to effectuate what it perceived to be the insured's intent to include Adams as a beneficiary. Memorandum Decision at 4. The district court was "guided by the principles applied by courts in exercising their equitable powers over testamentary wills and trusts." *Id.* at 2. Hence, it relied on accepted doctrine that

[a] court may reform a trust to cure an error that prevents the trust from fulfilling the deceased's intent. *See* IV A. Scott, The Law of Trusts § 333.4 (3d ed. 1967); *Berman v. Sandler,* 379 Mass. 506, 399 N.E.2d 17 (1980); *Roos v. Roos,* 42 Del.Ch. 40, ——, 203 A.2d 140, 143 (1964). Such reformation is justified where there are facts and circumstances which could not have been foreseen by the testator and a resulting loss to an intended beneficiary. *Probasco v. Clark,* 58 Md.App. 683 [687], 474 A.2d 221, 223 (1984). The interest of equity allows the court to modify the trust to prevent the impairment of the trust's primary purpose resulting from a change of circumstances unanticipated by the deceased. *In re Crichfield Trust,* 177 N.J. Super. 258, 426 A.2d 88 (1980).

Memorandum Decision at 3.

We see no basis here for application of these equitable principles. The insurance policy unambiguously designates only Daria Ibn-Tamas and Robert and Tamara Gamble as the contingent beneficiaries. There is no mention of children generally, other than in reference to those children designated by name. Nor is there any clause respecting children to be born at some future point in time. The trust provision follows the specific beneficiary designations in the policy. Although the trust refers to payments becoming due a "child," this, in our view, is a reference directly and only to those children named as beneficiaries. It is clear to us that the trust as

written serves exclusively as a mechanism for channeling proceeds which become due a *named* minor beneficiary. Therefore, the intent of the insured, at the time the contract was entered, may be gleaned entirely from the unambiguous language chosen.

In contending that the district court properly construed the trust in his favor, Adam directs our attention to decisions such as *Roquemore v. Dent*, 135 Ala. 292, 33 So. 178 (1902), and *Scull v. Aetna Life Insurance Co.*, 132 N.C. 30, 43 S.E. 504 (1903), in which life insurance policies payable to the children of the insured as beneficiaries were deemed payable to after-born children as well. These cases are distinguishable because they involved designations to children as a class. A case of the same era which is precisely on point is *Spry v. Williams*, 82 Iowa 61, 47 N.W. 890 (1891). In *Spry*, on facts virtually identical to those that we have in this case, the court denied equitable relief to the after-born daughter of the insured where the policy designated his other children by name:

> The words "his children" refer to those named, and cannot properly be construed to mean or embrace others yet unborn. On so plain a proposition there should be no dispute, nor can equitable considerations overrule an intent so manifest and legal. After [the insured's] marriage with the mother of Jessie Fay Meyer [the after-born daughter], he had the opportunity to so change his certificate as to extend its benefits to his widow and unborn child, which he did not do. And it is equally unreasonable and inequitable to omit from its benefits his widow as her child. He knew the situation, and we should assume that he had reasons for not making the change.

82 Iowa at 64, 47 N.W. at 891. We find this reasoning persuasive.

We address as a final matter Adam's contention that the facts warrant the imposition of a constructive trust on the insurance proceeds "in order to prevent unjust enrichment occasioned by the insured's murder." While this court has no authority to impose such a trust in a certi-

fied case, we suggest the facts here do not call for this remedy under District of Columbia law. " '[A] constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.' " *Hertz v. Klavan*, 374 A.2d 871, 873 (D.C. 1977) (quoting *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 382, 122 N.E. 378, 380 (1919) (Cardozo, J.)). That the insured was murdered in this case, rather than having died of natural causes, has, in our view, no bearing on our opinion as to the required disposition of the proceeds among the contingent beneficiaries. In our view, there are no grounds warranting the imposition of a constructive trust. *See generally Suydam v. United States*, 131 U.S.App.D.C. 352, 355, 404 F.2d 1329, 1332 (1968); *Desnoyers v. Metropolitan Life Insurance Co.*, 108 R.I. 100, 110–13, 272 A.2d 683, 689–90 (1971).

### V.

In conclusion, it is our view that Daria Ibn-Tamas is entitled, as a matter of District of Columbia law, to the entire balance of the proceeds on deposit in the district court registry.

MACK, Associate Judge, dissenting:

I look with approval upon the attempts of my colleagues to ground a framework within which, hopefully, our new "certification" statute will operate. I also applaud their efforts to isolate some of the problem areas that we may expect to surface. Yet it is this very helpful discussion that leads me to believe that the majority should not, indeed logically could not, reach the result that it has reached today.

In certifying a question of law to this court, the United States Court of Appeals for the District of Columbia Circuit has stated, on undisputed facts, that "[t]he sole and dispositive issue in this case is whether: (1) as the guardian ad litem for the third child (first child of the second marriage) contends, that child is entitled to the entire balance of the funds on deposit in the District Court's registry; or (2) as the

guardian ad litem for the fourth child (second child of the second marriage, born after the insured's death) contends, and as the District Court held, the insurance policy warrants *reformation* to designate the fourth child as a beneficiary, entitled to share equally with the third child the currently undistributed policy proceeds" (emphasis added). Appended to the certification was the Memorandum Opinion of the District Court (Judge Gesell) exercising its equitable power to reform the trust created in the policy to permit the fourth child (Adam) to share one-half the proceeds in the registry in equal share with the third child (Daria, the sister of Adam) so that all four children would share equally (*see* Appendix A).

Although I will not take issue with the majority's view that we may exercise our prerogative to frame the issue as we see fit for an informed decision, I fear that the reformation here has resulted in more confusion than help. Thus the majority not only respectfully disagrees with Judge Gesell's analysis and holding as to trust reformation (which sought some comfort from our decision in *Read v. Legg*, 493 A.2d 1013 (D.C.1985)) but it rephrases the initial inquiry in the ultimate terms of who shall prevail and it embraces a rigid contract theory under which Adam, presumably, could not prevail. Thus it puts aside for the moment the certified question, and lapses into a discussion aimed at showing that there has been no proof by Adam of a mutual mistake justifying contract reform nor has there been proof of substantial compliance (by the deceased father) with change-of-beneficiary requirements. Thereafter, returning to the question that the federal appellate court has asked, the majority recites the strong authority relied upon by Judge Gesell for the proposition that a court may reform a trust to cure an error that prevents the trust from fulfilling the deceased's intent, or where there are facts and circumstances which could not have been foreseen by the testator and a resulting loss to an intended beneficiary, or to prevent the impairment of the trust's primary purpose resulting from a change of circumstances unanticipated by the deceased. *See* Scott on Trusts, § 333.4 (3rd ed. 1967); *Probasco v. Clark*, 58 Md.App. 683, 687–88, 474 A.2d 221, 223 (1984); *Matter of Critchfield Trust*, 177 N.J.Super. 258, 426 A.2d 88 (1980). The majority dismisses Judge Gesell's findings, made pursuant to this authority,[1] with the comment that "We see no basis here for application of these equitable principles," and follows with reasoning that the policy "unambiguously designates" only Daria (and the two other named children by the first marriage) as the contingent beneficiaries—a proposition that no one would dispute.

In support of its position that equitable relief cannot be provided to the child born after the death of an insured, the majority finds persuasive the reasoning of *Spry v. Williams*, 82 Iowa 61, 47 N.W. 890 (1891). Even if we were to accept the premise, however, that what would not have been available in 1891 as equitable relief would not be available in 1987, the Iowa case is distinguishable for the basic reason that the facts are different. In *Spry*, there was no showing whatever that the deceased father intended that his unborn child or his widow share the proceeds of $1,702.65 with three children born of his prior liaison with another woman. Thus the Supreme Court of Iowa noted that the deceased had the opportunity to change his certificate to extend its benefits to his widow and unborn child and did not do so, that he knew the situation, and "we should assume that he had reasons for not making the change."

---

1. Judge Gesell wrote:
   It is clear that this father intended to provide for his unborn son, could not have foreseen the tragedy that prevented amending his insurance policy to name the child, resulting in a loss to his intended beneficiary and an inequitable distribution of the fund among his children. The deceased provided for all his children when he executed the policy in 1974 and there is every indication that he would have provided for his fourth child in the same manner. He displayed the generosity normally expected of a father and excluding his son from the benefits given to the other three children would undoubtedly be contrary to his intent.
   Appendix A 1215–1216.

*Id.* at 64, 47 N.W. at 891. The court noted that the record did not show what property the widow possessed, that it might be abundant for her and her child, who would inherit from her while the deceased's children by a former marriage would not. "[O]n the face of this record," said the court in affirming the district court, "[i]f the court should attempt ... to make the conduct of [the deceased] more equitable by creating a new beneficiary, it might defeat that which is absolutely just." *Id.* It seems apparent that this holding could not stand for the proposition that a court, under appropriate circumstances, could not reform a trust, albeit in an insurance policy, to carry out the intent of the deceased. It cannot stand for the proposition that a District of Columbia court, making findings of that intent supported by clear and convincing evidence in the record, cannot reform a trust. It cannot stand for the proposition that Judge Gesell, as a matter of law, and on adequate factual findings (*see* note 1), erred in holding that trust reformation is available to prevent impairment of the trust.[2]

Finally, the majority, recognizing as it must that we have upheld judgments imposing constructive trusts, suggests merely that there are no grounds here warranting the imposition of a constructive trust—a suggestion made without significant authority. Paradoxically, the majority volunteers that it has no authority to impose such a trust in a certified case but adds that the facts here do not call for this remedy under District of Columbia law. Yet in the case of *Hertz v. Klavan*, 374 A.2d 871, 873 (D.C.1977) (referred to by the majority only as quoting Justice Cardozo as to the equitable nature of a constructive trust) we upheld a constructive trust imposed by a trial judge, setting aside and canceling a deed (conveying real estate) executed by a widow four months prior to her death. We did so after recognizing that a deed conveying real estate is one of the most solemn instruments known to the law. We rejected the argument of the grantees that only evidence of fraud would be admissible to contradict the terms of the deed. We noted that a constructive trust was a flexible remedial device used to force restitution in order to prevent unjust enrichment, that parol evidence was admissible to show the actual intent of the parties, and that the trial court's finding that the deceased did not intend permanently to deprive herself of the property was supported by clear and convincing evidence and must be sustained.

Similarly in *Gray v. Gray, supra* note 2, we again upheld the imposition by a trial judge of a constructive trust on a family home. The trial court held that a daughter of the deceased homeowner, who was the surviving joint tenant on the deed to the home, must be deemed to be a trustee holding the property for the benefit of herself and her eight brothers and sisters. On the basis of evidence showing that the deceased homeowner enjoyed a warm and loving relationship with all nine of her children, and wished that the property remain a family home, the trial court ruled that as a matter of equity, the property belonged solely to the mother and that upon her death the equity passed intestate to all nine surviving children. In affirming, we noted, "[a]lthough a constructive trust may be impressed upon property irrespective of the intention of the parties, *see* RESTATEMENT OF RESTITUTION § 160, Comment a (1937), evidence that [the mother] intended such an equitable division of the property is a powerful factor favoring the court's conclusion." *Gray, supra*, 412 A.2d at 1211.

In light of this precedent, I do not see how the majority could conclude on the facts of this case that a court, as a matter of law, could neither reform a trust nor impress one. I respectfully dissent.

2. The majority, in its rejection of Judge Gesell's holding has raised serious problems not only for the certification process, but for the jurisdiction of our own courts to grant equitable relief. We have held in an analogous situation—where our Superior Court has imposed a constructive trust—that we may not set aside the judgment "except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." *Gray v. Gray*, 412 A.2d 1208, 1210 (D.C.1980), citing D.C.Code § 17-305(a) (1973).

**1216**

## APPENDIX

In the United States District Court for the District of Columbia

Civil Action No. 85–1075

Penn Mutual Life Insurance Company, Plaintiff,

v.

Frederick B. Abramson, et al., Defendants.

### MEMORANDUM

This is an interpleader action concerning the distribution of the proceeds of a life insurance policy trust fund among four minor children of the deceased. Court-ordered publication has failed to disclose any additional parties in interest. After reviewing extensive memoranda of fact and law filed by counsel appointed to represent the four children and the affidavit of the deceased's trustee, finding no material facts in dispute, the Court determines that further briefing and discovery is not necessary and proceeds to rule on the merits.

The deceased purchased an insurance policy in 1974 after he had divorced his first wife and remarried. At that time he had two children from his first marriage and one from his second marriage. He named his second wife as beneficiary of the entire policy, otherwise one-half the proceeds were to be paid in equal shares to his two children from his first marriage and one-half was to be paid to his daughter from his second marriage. The insurance proceeds were to be administered by a trustee for support, education and welfare of the children until they reached majority. All beneficiaries were designated by name.

In February, 1976 the deceased was murdered by his second wife who five months later gave birth to his fourth child, the second of his second marriage. Since the deceased's wife is not eligible to receive the proceeds of the policy, this action concerns whether the fourth child should share in the trust fund along with the other three children. The insurer has paid the proceeds of the policy, about $70,000 into the registry of the Court.

Since this is a life insurance policy that establishes a trust fund, the Court is guided by the principles applied by courts in exercising their equitable powers over testamentary wills and trusts. The Court's principle objective is to, as far as possible, have the trust comply with the intent of the deceased. If his "actual intent" cannot be discerned from the policy or extrinsic evidence, the Court will attribute to the deceased an intent that is most consistent with the available evidence and public policy. *See Read v. Legg*, 493 A.2d 1013, 1016–17 (D.C.App.1985).

The trustee for the children, a close friend of the deceased, met with the deceased the day before he died. The deceased was excited over the prospect of the birth of his second child and stated he was making plans to provide for all four children, including insurance. The deceased made it obvious to the trustee that he intended to provide for all four children. Statements in the record by the wife of the deceased support the trustee's view that the deceased intended to provide for his unborn son and would have wanted his son to share equally with the other children in the proceeds of this policy.

A court may reform a trust to cure an error that prevents the trust from fulfilling the deceased's intent. *See* Scott on Trusts § 333.4 (3rd ed. 1967); *Berman v. Sandler*, 379 Mass. 506, 399 N.E.2d 17, (1980); *Roos v. Roos*, 42 Del.Ch. 40, 203 A.2d 140, 143 (1964). Such reformation is justified where there are facts and circumstances which could not have been foreseen by the testator and a resulting loss to an intended beneficiary. *Probasco v. Clark*, 58 Md. App. 683, 474 A.2d 221, 223 (1984). The interest of equity allows the court to modify the trust to prevent impairment of the trust's primary purpose resulting from a change of circumstances unanticipated by the deceased. *Matter of Critchfield Trust*, 177 N.J.Super. 258, 426 A.2d 88 (1980).

Under the circumstances the Court finds that the proceeds of the insurance fund should be held in trust to be shared equally by all four children. It is clear that this father intended to provide for his unborn son, could not have foreseen the tragedy

that prevented amending his insurance policy to name the child, resulting in a loss to his intended beneficiary and an inequitable distribution of the fund among his children. The deceased provided for all his children when he executed the policy in 1974 and there is every indication that he would have provided for his fourth child in the same manner. He displayed the generosity normally expected of a father and excluding his son from the benefits given to the other three children would undoubtedly be contrary to his intent. Equity and public policy considerations indicate that the fourth child should be included by reforming the trust to designate him as a beneficiary to share one-half the proceeds of the policy in equal share with the first child of the second marriage so all four children shall share equally.

The Court expressed its appreciation for the learned assistance obtained from counsel appointed to represent the conflicting interests of the potential claimants and suggests that if any counsel seek fees they give consideration to the limited size of the fund and the needs of the beneficiaries. All requests for fees should be submitted to the Court by January 6, 1986.

Accordingly, an appropriate Order is filed contemporaneous with this memorandum.

/s/ Gerhard A. Gesell
United States District Judge

December 12, 1985