NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Appellant,

v.

The RIGGS NATIONAL BANK OF WASHINGTON, D.C., Appellee.

No. 92–7041.

United States Court of Appeals, District of Columbia Circuit.

Oct. 5, 1993.

Before: MIKVA, Chief Judge, WALD and SILBERMAN,* Circuit Judges

### CERTIFICATION OF QUESTIONS OF LAW

by the United States Court of Appeals for the District of Columbia Circuit to the District of Columbia Court of Appeals pursuant to D.C.Code § 11–723

On September 8, 1993, we heard oral argument in *National Union Fire Ins. Co. of Pittsburgh, Pa. v. The Riggs Nat'l Bank of Washington, D.C.,* No. 92–7041. Questions of District of Columbia law are determinative of the pending appeal, and these questions are significant ones as to which there are no controlling precedent in the decisions of the District of Columbia Court of Appeals. Therefore, on our own motion, we certify the questions of law to the District of Columbia Court of Appeals.

The questions of law to be answered are:

1. Under District of Columbia law, and given the facts described below, does the "Superior Equities Doctrine" apply to an action by an insurer as an assignee and conventional subrogee of its insured?

2. Under District of Columbia law, and given the facts described below, does the adoption of the Uniform Commercial Code, D.C.Code § 28:1–101 et seq., abrogate or modify the Superior Equities Doctrine?

These questions arose in an action, brought in federal court because of the parties' diversity of citizenship, against a bank by an insurance company as an assignee and conventional subrogee of the insured deposi-

tor. *See* Transcripts of the Court's Ruling, No. 91–1992 (D.D.C. February 25, 1992).

The facts relevant to the questions certified are as follows. Between April 20, 1990, and May 14, 1990, unknown individuals cashed 14 fraudulent checks, totalling $640,-712.38, drawn on the account of NHP Property Management, Inc. ("NHP") at the defendant Riggs National Bank ("Riggs"). On June 22, 1990, NHP requested that Riggs recredit its account for the loss. After Riggs formally denied the request on November 15, 1990, NHP submitted its proof of loss to National Union Fire Insurance Company ("National Union") and was paid $597,980 ($640,712.38 less $32,732.38 recovered from a third-party bank and a $10,000 deductible).

Section 14 of NHP's policy with National Union provides in relevant part:

In the event of any payment under this Policy, the Company shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

Pursuant to this provision, NHP assigned National Union all its rights against Riggs and agreed to be bound by the result of the suit.

National Union filed this suit against Riggs as an assignee and, by virtue of Section 14 of the policy, as a conventional subrogee of NHP. After a bench trial, the district court found that Riggs had complied with reasonable commercial standards in processing the checks and therefore was not negligent. The district court further held that, despite the clear presumption in the Uniform Commercial Code ("UCC") favoring the depositor against the bank, District of Columbia law requires a balancing of the equities when the depositor's *insurer* brings suit to recover from a bank, either by way of assignment or subrogation. Therefore, under the Superior Equities Doctrine, as between two innocent parties—National Union and Riggs—the equities balanced in favor of Riggs. National Union appealed, asserting

* A separate concurring statement filed by *Circuit*    *Judge* SILBERMAN is attached.

that the Superior Equities Doctrine does not apply when the insurer sues as an assignee and conventional subrogee, as opposed to an equitable subrogee.

We recognize that *Washington Mechanics' Savings Bank v. District Title Ins. Co.,* 65 F.2d 827 (D.C.Cir.1933), requires a balancing of the equities when the insurance policy does not contain an explicit subrogation provision, and the insurer thus brings suit as an equitable subrogee. This rule, the Superior Equities Doctrine, is apparently still good law. *See Schrier v. Home Indemnity Company,* 273 A.2d 248, 251 (D.C.App. 1971); *Traveler's Indemnity Co. v. Riggs Nat'l Bank,* 323 F.2d 804, 804 (D.C.Cir.1963).

It is unclear, however, whether the Superior Equities Doctrine applies when the insurer brings suit not as an equitable subrogee, but as an assignee or a conventional subrogee. Although both *Washington Mechanics'* and *Schrier* were equitable subrogation claims, some supporting authorities from other jurisdictions cited in those opinions involved conventional subrogation and assignments. *See, e.g., Bank of Fort Mill v. Lawyers' Title Ins.,* 268 F.2d 313, 316–17 (4th Cir.1959) ("[A]ssignment creates no right greater than the equitable right of subrogation."); *American Surety v. Bank of California,* 133 F.2d 160 (9th Cir.1943) ("If insurers have no right of subrogation, their position is not improved by the assignments to them of insured's claim against bank."); *see also Bachman v. Glazer,* 316 Md. 405, 559 A.2d 365, 370 (1989) ("A conventional subrogee is not necessarily entitled to subrogation as a matter of legal right; the relative equities of the parties are still to be balanced."). On the other hand, District of Columbia law establishes the general rule that all claims are freely assignable, and permits the assignee to stand in the same position as the assignor. *See* D.C.Code § 28–2303; *Flack v. Laster,* 417 A.2d 393, 398–99 (D.C.App.1980). Following this principle, the insurer should enjoy the same rights as its insured depositor, who indisputably prevails over the bank in the absence of negligence. *See* D.C.Code §§ 28:3–404, 28:4–406.

The latest decision from the Court of Appeals on this subject, *American Security Bank v. American Motorists Ins. Co.,* 538 A.2d 736 (D.C.App.1988), did not resolve the apparent conflict between the Superior Equities Doctrine and the free alienability of claims. In a discussion of the insurer's standing to bring suit, the court recognized the difference between conventional and equitable subrogation. *See id.* at 737 n. 1. The court cited 16 Couch on Insurance 2d, §§ 61.2, 61.3, which recognized authority stating that "a conventional subrogee does not have the burden of showing the superior equity in himself as plaintiff to authorize a recovery." However, because the insurer failed to prove the existence of a contract of subrogation, the court proceeded to analyze the equitable subrogation claim under the "balance of equities" framework of *Washington Mechanics'. See American Security,* 538 A.2d at 737 n. 1. The court thus left open the determinative question in this appeal, whether *Washington Mechanics'* applies to a case involving an assignment and conventional subrogation. Similarly, in *Anacostia Bank v. United States Fidelity & Guaranty Co.,* 119 F.2d 455 (D.C.Cir.1941), the insurer sued as both a subrogee and an assignee. But, because the court found that the bank was negligent, "[c]ases disallowing subrogation when 'equities are equal' [citing *Washington Mechanics'*] are not on point." *Id.* at 456.

Other jurisdictions have held that the enactment of the UCC abrogated or modified the Superior Equities Doctrine. *See, e.g., General Accident Ins. Co. of America v. Fidelity & Deposit Co. of Maryland,* 598 F.Supp. 1223, 1240 (E.D.Penn.1984) (After the adoption of the UCC, "the 'superior equity' analysis of the past may be obsolete."); *Hanover Ins. Companies v. Brotherhood State Bank,* 482 F.Supp. 501, 509 (D.Kan. 1979) ("The provisions of the UCC at § 3–406 and § 4–406 operate as at least a partial codification of the principles at work in the compensated surety defense."). The decisions of the District of Columbia Court of Appeals are unclear on this point. Although *Schrier* was decided after the enactment of the UCC, that case involved a stolen automobile and therefore was not subject to the UCC. In *American Security,* the court cited

to the balance of the equities analysis of *Washington Mechanics'*, *see* 538 A.2d at 737 n. 1, but analyzed the case under the UCC's burden shifting provisions. *See id.* at 738, 741. Because the bank was negligent, the balance of the equities and the UCC analysis rendered the same result. *See id.* at 737 n. 1. The effect of the UCC on the Superior Equities Doctrine thus remains an open question under D.C. law.

Given the above conflict and uncertainty, we believe that we cannot confidently decide these significant questions as a matter of District of Columbia law without further guidance from the District of Columbia Court of Appeals. *See Delahanty v. Hinckley*, 845 F.2d 1069, 1072 (D.C.Cir.1988); *Penn Mut. Life Ins. Co. v. Abramson*, 530 A.2d 1202, 1206 (D.C.App.1987).

Appended to this certification are (1) the judgment of the district court and the transcript of the district court's ruling in this case, filed February 17, 1992, and now *sub judice* before the United States Court of Appeals for the District of Columbia Circuit; and (2) three sets of the joint appendix and briefs of the parties, filed in the United States Court of Appeals for the District of Columbia Circuit, addressing the questions of law. [Editor's note: Appendix omitted from publication by the court.]

SILBERMAN, Circuit Judge, concurring:

I fully agree that we should certify the question raised to the D.C. Court of Appeals. I cannot resist, however, commenting (for which gratuitous remarks I hope I will be forgiven by our colleagues across the street) on the rather peculiar, indeed, primitive, understanding of economics that underlies the rationale a number of jurisdictions have offered to support the Superior Equities Doctrine. Sometimes referred to as the compensated surety defense, that rationale is premised on the notion that since the insurance company has been paid to assume the risk of loss, all other factors being equal, the innocent bank should be preferred to the innocent insurance company.

The palpable flaw in that logic is that the insurance company has been paid by the depositor, not the bank (which may have its own insurance), to assume the depositor's risk of loss—not the bank's. If the law imposes on the insurance company a greater risk than an uninsured depositor would bear, that will simply result in increased insurance premiums to depositors. Therefore, a doctrine that may well have its genesis in an unarticulated impulse to prefer *ex post* a local bank to a distant insurance company will simply raise costs for local depositors when viewed from an *ex ante* perspective, in accordance with sound legal and economic principles. *See* Frank H. Easterbrook, *The Supreme Court: 1983 Term—Foreword, The Court and the Economic System*, 98 HARV. L.REV. 4, 10–12 (1984).

In any event, as between two faultless parties, liability should rest with the one who is best positioned to avoid the loss. *See* Guido Calabresi, *The Decision for Accidents: An Approach to Nonfault Allocation of Costs*, 78 HARV.L.REV. 713 (1965). Placing liability with the least-cost avoider increases the incentive for that party to adopt preventive measures and ensures that such measures would have the greatest marginal effect on preventing the loss. This efficiency-promoting principle informs the burden-shifting provisions of the UCC, D.C.Code §§ 28:3–406, 28:4–406. *See Putnam Rolling Ladder Co., Inc. v. Manufacturers Hanover Trust Co.*, 74 N.Y.2d 340, 547 N.Y.S.2d 611, 613, 546 N.E.2d 904, 908 (1989) ("By prospectively establishing rules of liability that are generally based not on actual fault but on allocating responsibility to the party best able to prevent the loss by the exercise of care, the UCC not only guides commercial behavior but also increases certainty in the marketplace and efficiency in dispute resolution."). Where both parties are without fault, the bank is better able to avoid the loss, since it occupies the better position to detect the forgery and stop the fraud before it succeeds.

This analysis may suggest a different result when the fraud is perpetrated by a dishonest employee of the depositor (with the insurer acting as a fidelity insurer) as opposed to an unknown third party (and the insurer acts as an indemnity insurer). In the former case, the employer-depositor is arguably better able to avoid the theft by adopt-

ing more stringent personnel screening and security measures, and courts have recognized this difference. *See South Carolina Nat'l Bank of Charleston v. Lake City State Bank*, 251 S.C. 500, 164 S.E.2d 103, 105–06 (1968); *Louisville Trust Co. v. Royal Indem. Co.*, 230 Ky. 482, 20 S.W.2d 71, 72 (1929). *Washington Mechanics' Savings Bank v. District Title Ins. Co.*, 65 F.2d 827 (D.C.Cir. 1933), *Anacostia Bank v. United States Fidelity & Guaranty Co.*, 119 F.2d 455 (D.C.Cir.1941), and *American Security Bank v. American Motorists Ins. Co.*, 538 A.2d 736 (D.C.App.1988) are all cases involving dishonest employees or fiduciaries.