AMERICAN SECURITY BANK,
N.A., Appellant,

v.

AMERICAN MOTORISTS INSURANCE
COMPANY, Appellee.

AMERICAN MOTORISTS INSURANCE
COMPANY, Appellant,

v.

AMERICAN SECURITY BANK,
N.A., Appellee.

Nos. 86–456, 86–512.

District of Columbia Court of Appeals.

Argued July 9, 1987.
Decided March 7, 1988.

Dale A. Cooter, with whom Donna S. Mangold, Washington, D.C., was on the brief, for American Sec. Bank.

Christopher E. Hassell, Washington, D.C., for American Motorists Ins. Co.

Before NEWMAN, FERREN and BELSON, Associate Judges.

BELSON, Associate Judge:

This appeal involves a bank's liability, under article three of the Uniform Commercial Code, for a series of checks it paid over a forged drawer's signature. Although the trial court found that the bank's customer had negligently contributed to the forgeries, it also found that the bank had not complied with reasonable commercial standards when it failed to detect the forgeries and paid the checks. The court therefore found the bank liable under D.C.Code §§ 28:3–406 and 28:4–406 (1981). Because the trial judge's factual finding that the bank was negligent in cashing the checks was not clearly erroneous, we affirm.

**I.**

The American Society for Parenteral and Enteral Nutrition, Inc. ("ASPEN") is a nonprofit membership organization. ASPEN maintained a checking account with appel-

lant American Security Bank ("the bank"). ASPEN's executive director, Barney Sellers, was one of five persons having signing authority for the account.

At the time of the events leading up to this case, ASPEN had a total of five or six employees. In May 1982, it hired Diane McCrae to serve as office manager and as Sellers' secretary. McCrae, who was hired in part because of her experience in bookkeeping and business practices, maintained physical possession of ASPEN's checkbook and prepared checks for Sellers' signature. McCrae was also responsible for receiving and reviewing the bank statements and cancelled checks, and for delivering them to ASPEN's bookkeeper, who was to reconcile the items in the bank statement with the numbers on the checks. At some point during McCrae's employment, ASPEN hired a financial manager, who also was responsible for looking at the bank statements.

In mid-September, one of ASPEN's employees noticed a cancelled check that listed as payee a company with which the employee was unfamiliar. Unable to find an invoice that corresponded with the check, Sellers examined the check and discovered that his name on the signature line "was not [his] handwriting." An examination of prior bank statements uncovered twenty-four checks bearing similarly forged drawers' signatures. On some of the checks the payee line appeared to have been erased. The bank had paid a total of $38,016.48 from ASPEN's account for the unauthorized checks. McCrae later pled guilty to criminal charges arising from this incident.

■ Sellers notified the bank of the forged checks the morning after he discovered them. Several days later, ASPEN's attorney sent a letter to the bank asking it to recredit ASPEN's account for the amount it had paid on those checks. The bank refused. ASPEN filed an insurance claim with its insurer, appellee American Motorists Insurance Company ("insurer"), which paid ASPEN's claim for $38,016.48. Insurer sued the bank for reimbursement in that amount.[1]

At trial, the bank presented as a witness Joann Bell, the manager of its account maintenance department. Bell testified to the procedures followed by the bank in filing checks presented for payment. According to Bell, checks from a particular account are given to one of six check filers, each of whom handles approximately 5,000 checks per day. The check filer verifies

1. At trial and on appeal, the bank has challenged ASPEN's insurer's standing to bring suit as ASPEN's subrogee. Contrary to the insurer's contention, the bank did not waive this issue by failing to raise it in its pre-trial statement. *See Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.,* 116 U.S.App.D.C. 285, 293, 323 F.2d 290, 298 (1963) (cannot waive issue of standing because standing is jurisdictional and "[j]urisdiction cannot be conferred by waiver ..."), *rev'd on other grounds,* 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965).

The bank argues that the insurer did not have standing to sue unless it was legally or equitably subrogated to ASPEN. Because the insurer did not produce the necessary declarations page of its insurance policy with ASPEN, the trial court deemed the policy inadmissible. The insurer thus failed to prove conventional subrogation. *See* 16 Couch on Insurance 2d §§ 61:2, 61:3 (Rev. ed. 1983) [hereinafter 16 Couch] (distinguishing conventional subrogation arising out of contract from subrogation by operation of law). Nevertheless, under equitable principles, the insurer's payment to ASPEN for its insurance claim conferred upon it "instanter" the right to sue in ASPEN's stead. *See London Guar. & Accident Co. v. Enterprising Servs., Inc.,* 192 A.2d 292, 293 (D.C.1963); 16 Couch, *supra,* § 61:20.

The bank argues that the insurer was precluded from asserting equitable subrogation because the "balance of equities" did not weigh in the insurer's favor. *See Washington Mechanics' Sav. Bank v. Dist. Title Ins. Co.,* 62 App.D.C. 194, 196, 65 F.2d 827, 829 (1933); 16 Couch, *supra,* § 61:21. In the particular factual situation at issue here, however, we find the question of the "balance of equities," as between the subrogee insurer and the bank, to be indistinguishable from the merits of the case: if, as the trial court found, the bank was negligent in cashing the forged checks, the insurer (which did not itself contribute to the forgeries) possessed superior equities and was thus entitled to invoke equitable subrogation. *Cf. Washington Mechanics', supra,* 62 U.S.App.D.C. at 197, 65 F.2d at 830 (bonding company's equities not superior to those of bank when bank cashed check in ordinary course of business and with no reason to doubt genuineness). Since we cannot resolve the equitable issues without, in effect, deciding the merits of the case, we go on to consider the merits. Our resolution of the merits resolves the standing issue in the insurer's favor.

that the account number is correct, that the date is current, that the checks are signed, and, for checks over $20,000, that the endorsement is proper. The filer then compares the drawer's signature on the check with the signature card for the account. Bell testified that the check filer for ASPEN's account had followed these prescribed procedures, that the signatures were sufficiently similar that the filer could not have detected the forgery in the normal course of business, and that, in Bell's opinion, the filer had performed her duties satisfactorily.

The bank also presented Donald Beck, a former employee of the bank, as an expert in the area of bank operations and check processing. Beck testified that the bank's check filing procedures were the same as or similar to those at other banks, and that the individual filers' workloads met national and local banking standards. He explained that, in checking for forgeries, the check filers "are not specifically forgery experts[,]" and look only for "large dissimilarities." Beck testified further that, in his opinion, the specific procedures followed in processing ASPEN's checks were in accordance with commercially reasonable standards.

The trial court issued a written order holding the bank liable for having paid the forged checks. The court first found that ASPEN's negligent supervision of McCrae, as well as its inadequate accounting procedures, "substantially contributed" to the making of the forgeries under D.C.Code § 28:3–406 (1981). It also found that ASPEN did not exercise reasonable care and diligence in examining its bank statements and in reporting the forgeries, as required by D.C.Code § 28:4–406 (1981). The court went on to find, however, that although the bank had instituted commercially reasonable procedures, it had negligently failed to comply with those procedures, and thus "did not act in accordance with its own reasonable commercial standards." In making this finding, the court relied on its own examination of copies of the checks and signature card, as well as on the fact that the check filer had been "lightly reprimanded" for not detecting the forgeries. Despite its determination that ASPEN was negligent, therefore, the court held that the bank was liable for the full amount of the checks for which it had debited ASPEN's account. See D.C.Code §§ 28:3–406, :4–406(3) (1981). The bank appeals from the court's finding of liability, and the insurer cross-appeals from the court's finding of negligent supervision.

## II.

■ Generally, a person is not liable on an instrument unless it bears his or her signature. D.C.Code § 28:3–401(1) (1981). Thus, a drawee bank may not charge a drawer's account for a check bearing a signature other than that of the drawer, because the "unauthorized signature is wholly inoperative as that of the person whose name is signed...." D.C.Code § 28:3–404(1) (1981). An exception to the above rule applies when the drawer "is precluded from denying" the unauthorized signature. Id. Specifically,

[a]ny person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the ... lack of authority ... against a drawee [the bank] or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

D.C.Code § 28:3–406 (1981). Thus, a drawer's negligence that contributes to a forgery negates the drawee bank's liability, but only if the drawee bank meets its burden of proving by a preponderance of the evidence that it complied with reasonable commercial standards when it cashed the check. See American Machine Tool Distrib. v. Nat'l Permanent Fed. Sav., 464 A.2d 907, 912 (D.C.1983).[2]

2. Because we affirm the trial court's finding that the bank in this case did not prove that it complied with reasonable commercial standards, we need not reach the issue raised by the insurer's cross-appeal, viz., whether the trial court's finding that ASPEN's negligence substantially contributed to the forgeries was clearly erroneous.

In the instant case, the trial court found that the bank had not complied with reasonable commercial standards when it cashed the series of forged checks, and thus held it liable for having paid those checks from ASPEN's account. The trial court reasoned that, although the bank had instituted reasonable banking practices, the nature of the forgeries that it failed to detect was such that the bank could not have been exercising those practices when it cashed the checks.[3] The court reasoned as follows:

> The procedures used by the [bank] which comported with reasonable commercial banking standards included the undertaking of comparing the drawer's signature on the check which was presented for payment with the signature appearing on the authorization card. The evidence presented at trial and a review of the exhibits which were introduced into evidence disclose that *none* of the forged checks bore the correct spelling of the drawer's name [Barney Sellers]. The ending "s" was clearly omitted from all of the forged signatures.... It is hard to imagine the purpose behind having a check filer compare signatures if it is not to at least check for the correct spelling of the drawer's name.... This is not [a] case where the ending letter of the name was scribbled or otherwise undiscernible. In the true signature of Mr. Sellers, the ending "s" was clearly evident; in the forged signature, the ending "r" and the omission of the "s" were clearly evident. When the [bank] has imposed on itself the duty to compare signatures (a duty which is in keeping with reasonable banking procedure according to the testimony), it has the duty to see what is clearly there to be seen.

The court also relied to some extent on the check filer's testimony that she had received a mild reprimand for not detecting the forgery; however, the court's order indicates that its principal reliance was on its own examination of the documentary evidence, *viz.*, the signature card, and this court reviews the trial court's findings in that light.

Until recently, there was some confusion with respect to the proper standard for appellate review of a finding of fact based primarily on documentary evidence. *See* FED.R.CIV.P. 52 advisory committee's note. Several decisions from this court and those of other jurisdictions suggested a *de novo* standard when reviewing findings based on evidence that the reviewing court was as able as the trial court to examine, contrasting such evidence with oral testimony, for which the trial court's ability to make credibility determinations required greater deference. *See Frazier v. Center Motors, Inc.*, 418 A.2d 1018, 1024 & n. 10 (D.C.1980) (making finding *de novo* that statement in fine print not conspicuous); *Dollar v. Land*, 87 U.S.App.D.C. 214, 217–18, 184 F.2d 245, 248–49 (appellate court may disregard finding when based on written evidence alone), *cert. denied*, 340 U.S. 884, 71 S.Ct. 198, 95 L.Ed. 641 (1950); *see also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citing cases that assert theory of *de novo* review of findings based on documentary evidence). Notwithstanding decisions such as these, the Supreme Court has repeatedly confirmed the precept that the "clearly erroneous" standard applies to review of all factual findings, whether they are based on oral or on documentary evidence. *Anderson, supra*, 470 U.S. at 574–75, 105 S.Ct. at 1511–12; *Bose Corp. v. Consumers Union of United*

---

**3.** The bank contends that this finding was not supported by evidence in the record because the signature card on which the court relied was never moved into evidence at trial. Significantly, the bank does not argue that the card was inadmissible, but only that the insurer did not say the words necessary for it to be technically admitted. We find the bank's argument unpersuasive, and reject it. The bank's counsel himself produced the card at trial, and willingly stipulated to its authenticity. Furthermore, both parties and the court treated the card as if it had been properly admitted, and the insurer's counsel referred to the card without objection during his closing argument. Finally, the card was listed and marked as having been admitted into evidence without objection. In light of its extensive use at trial, without objection, we consider the signature card as duly admitted evidence that supports the trial court's findings.

*States, Inc.,* 466 U.S. 485, 500, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984); *cf. Pullman–Standard v. Swint,* 456 U.S. 273, 301–02 & n. 7, 102 S.Ct. 1781, 1796–97 & n. 7, 72 L.Ed.2d 66 (1982) (Marshall, J., dissenting) (conceding that clearly-erroneous rule applies to documentary evidence, but stating that appellate court free to substitute its own reading of undisputed documents evidencing discriminatory intent).

Any lingering uncertainty regarding the proper scope of review of document-based findings has been resolved by a recent amendment to SUPER.CT.CIV.R. 52(a), following an identical amendment in 1985 to its federal counterpart, FED.R.CIV.P. 52(a), so that the pertinent portion of those rules now reads, "Findings of fact, *whether based on oral or documentary evidence,* shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." SUPER. CT.CIV.R. 52 (a) (amendment of March 2, 1987, emphasized); FED.R.CIV.P. 52(a). It is true that, as before the amendment, Rule 52's reference to due regard to credibility determinations calls attention to a trial judge's unique ability to make such determinations, and therefore emphasizes the particular need for deference when findings are based on verbal testimony. *See Anderson, supra,* 470 U.S. at 574, 105 S.Ct. at 1511 (former Rule 52 demands even greater deference to findings based on credibility determinations); *Bose Corp., supra,* 466 U.S. at 500, 104 S.Ct. at 1959 ("clearly erroneous" standard applies both to findings based on documentary evidence and those based on oral testimony, but presumption of correctness has more force in latter case); *District of Columbia v. Megginson,* 250 A.2d 571, 572–73 (D.C. 1969) (reviewing documentary evidence "with particular care" when applying "clearly erroneous" standard); *Bishop v. United States,* 96 U.S.App.D.C. 117, 121–22, 223 F.2d 582, 586–87 (1955) (despite difference between scope of examination of *findings* based on documentary as distinguished from testimonial evidence, "in neither case may an appellate court reverse unless it has a firm conviction of clear error in the findings"), *vacated on other grounds,* 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956). As the Court stated in *Anderson, supra,* however,

The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources.... As the Court has stated in a different context, the trial on the merits should be "the 'main event' ... rather than a 'tryout on the road.'"

470 U.S. at 574–75, 105 S.Ct. at 1512 (quoting *Wainwright v. Sykes,* 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977)); *see also* FED.R.CIV.P. 52 advisory committee's note ("To permit courts of appeals to share more actively in the fact-finding function would tend to undermine the legitimacy of the district courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.").

We thus look only at whether the trial court's findings, although based on documentary evidence, were clearly erroneous. Doing so, we are unable to lay claim to a "definite and firm conviction" that the court was mistaken in finding that the bank failed to exercise commercially reasonable procedures when it failed to detect McCrae's forgeries. *See United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) (finding is "clearly erroneous" when although there is evidence to support it, reviewing court "is left with definite and firm conviction that a mistake has been committed"). The record supports both the court's observation that the forged signature of "Sellers" lacked the final "s," and its perception that the authorized signature on the signature card contained a "clearly evident" final "s." Since the court's find-

ing that the check filer would have noticed this disparity had she adhered to reasonable commercial procedures is "plausible in light of the record viewed in its entirety," we will not disturb that determination, whether or not we might have viewed the evidence differently ourselves. *Anderson, supra,* 470 U.S. at 573–74, 105 S.Ct. at 1511. We therefore affirm the court's finding that the bank did not exercise commercially reasonable procedures when it paid the forged checks, and thus that it was foreclosed from asserting as a defense against liability that ASPEN's negligence had substantially contributed to those forgeries.

## III.

The bank argues that, even if ASPEN's contribution to the forgeries did not preclude the insurer from asserting the bank's liability under D.C.Code § 28:3–406 (1981), its liability is nevertheless limited under D.C.Code § 28:4–406 (1981). That section provides in relevant part:

(1) When a bank sends to its customers a statement of account accompanied by items paid in good faith in support of the debit entries ... the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature ... and must notify the bank promptly after discovery thereof.

(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank

. . . .

(b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

*Id.* Citing this provision, the bank argues that ASPEN did not exercise reasonable care and promptness in examining its bank statement, and thus that the insurer is precluded from asserting the bank's liability for those checks paid more than fourteen days after ASPEN received the first bank statement that contained checks paid over McCrae's forged signature.

We need not address the issue of ASPEN's negligence in failing earlier to examine its bank statements and to report the forgeries to the bank, however, because the trial court found that ASPEN had established the bank's lack of ordinary care under § 28:4–406(3). That subsection provides, "The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s)." D.C.Code § 28:4–406(3) (1981). We note that this provision shifts the burden imposed under § 28:3–406, *i.e.,* that the bank must prove commercial reasonableness, *see American Machine, supra,* 464 A.2d at 912, to the customer, who must prove the bank's *lack* of reasonableness, that is, its lack of ordinary care. It is clear from the trial court's order that it applied the latter, correct standard when it found the bank negligent in honoring the forged checks. As discussed above, we cannot say that this finding was clearly erroneous. Since the trial court found that the bank did not exercise reasonable care when it paid the checks over the forged drawer's signatures, the bank cannot rely on ASPEN's lack of promptness in discovering and reporting the forgeries to limit its liability.

*Affirmed.*