*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-SP-0787

LAVELL COX, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2019-CNC-000479)

(Hon. Robert E. Morin, Trial Judge)
(Hon. Anita Josey-Herring, Trial Judge on Remand)

(Argued April 19, 2022                                    Decided October 24, 2024)

*KC Bridges*, Public Defender Service, with whom *Samia Fam* and *Shilpa S. Satoskar*, Public Defender Service, were on the brief, for appellant.

*Bryan H. Han*, Assistant United States Attorney, with whom *Channing D. Phillips*, Acting United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *John P. Gidez*, Assistant United States Attorneys, were on the brief, for the United States.

Before MCLEESE, *Associate Judge*, and RUIZ and GLICKMAN,[*] *Senior Judges*.

---

[*] Judge Glickman was an Associate Judge at the time of argument. His status changed to Senior Judge on December 21, 2022.

MCLEESE, *Associate Judge*: Appellant Lavell Cox challenges an order requiring him to register for life in the District of Columbia as a sex offender. We affirm.

## I. Factual and Procedural Background

Mr. Cox was convicted in Wisconsin in 1993 of third-degree sexual assault. After Mr. Cox was released from prison, Wisconsin required him to register as a sex offender for fifteen years. Mr. Cox subsequently relocated to the District.

In February 2019, the Court Services and Offender Supervision Agency for the District of Columbia ("CSOSA") notified Mr. Cox that he was required to register as a sex offender in the District for life pursuant to the District of Columbia Sex Offender Registration Act ("SORA"), D.C. Code § 22-4001 et seq. On March 13, 2019, Mr. Cox filed a motion in Superior Court seeking review of CSOSA's determination. In his motion, Mr. Cox argued, among other things, that he was not required to register for life as a sex offender in the District because his Wisconsin conviction was not substantially similar to any lifetime-registration offense under SORA.

In response, the United States argued that Mr. Cox's Wisconsin conviction involved conduct that was substantially similar to the District's offenses of first-degree and second-degree sexual abuse, which require lifetime registration. The

government submitted a number of court records from Wisconsin, including a written waiver-of-rights form reflecting Mr. Cox's guilty plea, which was entered pursuant to *North Carolina v. Alford*, 400 U.S. 25, 37-38 (1970) (holding that defendant may plead guilty while professing innocence if there is "strong evidence of actual guilt"); the criminal complaint and accompanying police affidavit; and the judgment of conviction. According to the criminal complaint, Mr. Cox repeatedly struck the complaining witness, including with a baseball bat, and threatened her to force her to comply with sexual acts against her will.

SORA requires the trial court to rule on a motion challenging a registration determination by CSOSA within sixty days of the filing of the motion. D.C. Code § 22-4004(a)(2)(B). Although Mr. Cox's motion was filed on March 13, 2019, the trial court nevertheless scheduled a hearing on the motion for June 21, 2019. The parties did not object to the trial court's setting of the hearing for a date that was beyond SORA's deadline.

At the hearing, Mr. Cox argued that the United States had failed to prove that his Wisconsin conviction was substantially similar to a lifetime-registration offense in the District. Specifically, Mr. Cox argued that the Wisconsin judgment of conviction for third-degree sexual assault was insufficient because "force" and "threats of force" are elements of first-degree and second-degree sexual abuse in the District but are not elements of third-degree sexual assault under Wisconsin law.

Mr. Cox also argued that the criminal complaint and the attached affidavit were insufficient to prove that he used force or threats of force because he had never admitted to using force or threats of force, there was no record from the Wisconsin proceeding to "actually show that force was used," and the complaint contained multiple layers of hearsay.

The trial court agreed with the United States that, under SORA, the court and CSOSA are allowed to look beyond the judgment of conviction to the underlying evidence of criminal conduct to determine whether that conduct is "analog[ous] to elements in the [corresponding] District of Columbia offense." The trial court, however, inquired whether the United States had any records from the Wisconsin proceeding that might indicate that Mr. Cox had admitted to using force or threats of force. The United States acknowledged that it had not sought to obtain such records. The trial court granted the government a continuance of three weeks in order to obtain the plea-hearing transcript or other related records. Mr. Cox objected to the continuance, arguing that a continuance would violate SORA's deadline and expressing concern about a negative impact on Mr. Cox's ability to apply for veteran's benefits and "other things."

The United States obtained additional information from Wisconsin and provided that information to Mr. Cox and the trial court. After the parties submitted supplemental filings, the trial court held the continued hearing on July 31, 2019. At

the hearing, Mr. Cox renewed his objection to the trial court's granting of a continuance, arguing that the court should rule on the record as it existed on the initial hearing date. The trial court disagreed with that argument and considered the additional information provided by the United States. That additional information included the preliminary-hearing and sentencing transcripts from Mr. Cox's Wisconsin conviction.

At the preliminary hearing, the complaining witness testified to Mr. Cox's use of violence and threats during the sexual assault, including that Mr. Cox beat her, grabbed her by the hair, slammed her head into the floor, punched her in the head repeatedly, choked her, hit her with a baseball bat, vaginally raped her, forced her to engage in oral sex, and threatened to beat her with an extension cord. The complaining witness also testified that she went to a doctor to get treatment for her injuries. The defense cross-examined the complaining witness, but the trial court sustained objections to many questions, including whether the complaining witness was injured during the incident and whether the complaining witness had ever previously made false allegations.

At sentencing, the prosecutor noted that Mr. Cox had denied using violence against the complaining witness. In an effort to refute that denial, the prosecutor provided the sentencing judge with medical records that the prosecutor asserted reflected various injuries that Mr. Cox had inflicted upon the complaining witness.

The sentencing judge indicated that the medical records described pain to the back of the head, abrasions, scratches to the lower jaw, a scratch on the forehead, bruises on each side of the neck, and bruises to the arm.

Defense counsel acknowledged at sentencing that there had been a "fight" between Mr. Cox and the complaining witness and did not dispute the description of the injuries reflected in the medical records. Instead, defense counsel argued that those injuries were not consistent with the complaining witness having been struck hard in the head with a baseball bat. Defense counsel also noted that Mr. Cox's position was that Mr. Cox and the complaining witness had consensual sex.

Mr. Cox spoke at sentencing. He denied being a racist and said that "deep inside [he is] a good person." He acknowledged having a problem with anger and that his anger "came out" during the incident at issue.

Mr. Cox explained that he had believed that the complaining witness was carrying his child and that he had been planning to marry her. He also had sold cocaine to try to help her get a place to live. After spending time in jail, he got out and obtained a job.

Mr. Cox stated that he and the complaining witness had previously "got[ten] into it," and the police had been called. Mr. Cox acknowledged that the complaining witness had obtained a protection order against him, but he stated that in fact the

complaining witness had lied about that incident. He also described another incident in which the complaining witness had caused Mr. Cox's probation officer to arrest Mr. Cox but the probation officer later determined that the arrest was not valid.

On the night of the incident, Mr. Cox had just learned that in fact he was not the father of the complaining witness's child. Mr. Cox said at sentencing that he had been a fool and that the complaining witness had been using him.

Mr. Cox said that he still loved the complaining witness and had no bitterness toward her. He had been trying to help her and had "tried to be as nice as he could." Mr. Cox also described the things he wanted to do with his life, including writing songs.

Mr. Cox said that he "was angry," that he "did break the law as far as fighting" the complaining witness, but that the complaining witness had consented to having sex. Mr. Cox also told the sentencing judge that he was "learning to control the violence." During the sentencing hearing, Mr. Cox did not personally deny inflicting injuries upon the complaining witness. He also said that he was not telling the trial judge that he was not guilty. He said that "[i]f the [complaining witness] felt as though she was being assaulted or whatever, then justice must be served."

The sentencing judge indicated that the offense was a violent sexual assault. The sentencing judge did express doubt, however, that Mr. Cox violently used a

baseball bat in the assault. The sentencing judge acknowledged the possibility that some of the blame for the incident might rest with the complaining witness and expressed the view that Mr. Cox had reason to be angry. The sentencing judge explained, however, that Mr. Cox's anger should have led Mr. Cox to leave, but instead that anger led to a disagreement and a sexual assault.

Based on the foregoing evidence about the basis for Mr. Cox's Wisconsin conviction, the trial court found that the United States had "barely" proved by a preponderance of the evidence that Mr. Cox "inflicted injuries on the complainant during the course of the offense." In so ruling, the trial court described the case as close and noted evidence pointing in both directions. Specifically, in favor of Mr. Cox, the trial court noted that (1) Mr. Cox entered an *Alford* plea in which he did not admit to many of the allegations, including the use of a bat; (2) Mr. Cox had denied using force or violence; (3) the sentencing court expressed doubt as to whether Mr. Cox used a bat; and (4) the cross-examination of the complaining witness at the preliminary hearing was "substantially limited." On the other hand, however, the trial court noted (1) the complaining witness's testimony that Mr. Cox used force to sexually assault her; (2) the physical injuries reflected in the medical records as described at sentencing; and (3) Mr. Cox's statements at sentencing that he "was angry" and "did break the law as far as fighting" the complaining witness, which the trial court interpreted as "admitting to committing an assault against the

complainant." Additionally, the trial court stated that it was required to give deference to CSOSA's determination "so long as [the determination was] reasonable."

Based on its factual finding, the trial court ruled that Mr. Cox was required to register for life in the District, because Mr. Cox's Wisconsin conviction involved the use of force and therefore was substantially similar to first-degree sexual abuse under District of Columbia law. The trial court noted, however, that it would have ruled otherwise if it had not considered the additional materials provided after the continuance was granted.

Mr. Cox appealed to this court, arguing, among other things, that the trial court erred in giving deference to CSOSA's decision. The United States correctly conceded that CSOSA's decision was not entitled to deference. *See In re W.M.*, 851 A.2d 431, 455 (D.C. 2004) ("Where an initial factual determination is made by [CSOSA] . . . due process requires that the person whose rights are affected be able to obtain *de novo* review by [the Superior Court]."). We therefore remanded the record for the trial court to reconsider its ruling without according any deference to CSOSA's decision.

In February 2024, the trial court on remand determined, without according any deference to CSOSA, that the United States had established by a preponderance of the evidence that Mr. Cox used force or the threat of force in committing the

Wisconsin offense. The trial court's reasons for making that finding were essentially the same as those given by the trial court in its initial ruling.

After the trial court's ruling on remand, this court invited the parties to file supplemental briefs, but the parties jointly requested that court instead decide the case without further briefing or argument. This court granted that request. We note that Mr. Cox had at one point before our remand requested leave to file a supplemental brief addressing an issue that he had not initially briefed, and this court had granted that request. We understand Mr. Cox's most recent filing to abandon that request for supplemental briefing.

## II. Analysis

### A. General Legal Principles

SORA requires persons who have committed serious sex offenses to register with CSOSA if they live, reside, work, or attend school in the District of Columbia. *In re W.M.*, 851 A.2d at 436; *see also* D.C. Code § 22-4001(6), (8), (9); § 22-4007; § 22-4014. Persons who commit first- or second-degree sexual abuse in the District of Columbia must register for life. D.C. Code § 22-4001(6)(A). Persons who commit an out-of-jurisdiction offense must register for life if the out-of-jurisdiction offense "involved conduct that would constitute" a lifetime-registration offense "if

committed in the District" or involved "conduct which is substantially similar to" an in-jurisdiction lifetime-registration offense. D.C. Code § 22-4001(6)(E).

A person commits first-degree sexual abuse by, among other things, "caus[ing] another person to engage in or submit to a sexual act . . . [b]y using force against that other person." D.C. Code § 22-3002(a)(l). A person commits second-degree sexual abuse by, among other things, "caus[ing] another person to engage in or submit to a sexual act . . . [b]y threatening or placing that other person in reasonable fear . . . that any person will be subject to death, bodily injury, or kidnapping." D.C. Code § 22-3003(1).

If CSOSA determines that a person is required to register based on a factual determination about the nature of the conduct underlying that person's out-of-jurisdiction offense, the person may seek review of that factual determination in Superior Court. *See In re W.M.*, 851 A.2d at 453; D.C. Code § 22-4004(a)(1)(A)(ii). The Superior Court decides that factual issue de novo, and the United States bears the burden of proving the disputed fact by a preponderance of the evidence. *In re W.M.*, 851 A.2d at 455.

## B. Continuance

"[T]he grant or denial of a continuance rests within the sound discretion of the trial judge, to whom we accord wide latitude." *Moctar v. United States*, 718 A.2d

1063, 1065 (D.C. 1998); *see also Tucker v. United States*, 571 A.2d 797, 800 (D.C. 1990) (trial-court ruling granting or denying continuance "should rarely be reversed"). Mr. Cox argues that the trial court acted outside the scope of its discretion in granting the United States's request for a continuance. To the extent that Mr. Cox's argument rests on SORA's statutory deadline, we address that argument in Part II.C of this opinion. Considering first the trial court's general exercise of discretion in granting a continuance, we see no basis for reversal.

In reviewing trial-court continuance rulings, we have focused on whether the requested continuance was "reasonably necessary for a just determination of the cause." *Brooks v. United States*, 130 A.3d 952, 960 (D.C. 2016). We have identified a number of factors to consider when reviewing a trial court's ruling granting or denying a continuance so that a party can obtain additional evidence. *Gilliam v. United States*, 80 A.3d 192, 202 (D.C. 2013). Those factors include

> (1) the probative value of the evidence sought, (2) the likelihood the evidence can be obtained, (3) whether the party seeking the continuance has exercised due diligence in finding that evidence, (4) the prejudice that would result from the denial of the continuance, (5) the prejudice to the opposing party [that would result from the granting of] the continuance . . . , and (6) the duration of the continuance and its potential disruption or delay of the [proceeding].

*Askew v. United States*, 229 A.3d 1230, 1239 (D.C. 2020). We also consider "the reasons for the request for a continuance," "any lack of good faith," and "the public's

interest in the prompt and efficient administration of justice." *Brooks*, 130 A.3d at 960 (internal quotation marks omitted).

Some of our cases have described a subset of these factors instead as flat requirements, each of which a party must establish in order for the trial court to permissibly grant a motion for a continuance to obtain evidence. *See, e.g.*, *Bedney v. United States*, 684 A.2d 759, 766 (D.C. 1996) (party seeking continuance to locate missing witness "must make a fivefold showing": "(1) who the missing witness is, (2) what the witness'[s] testimony would be, (3) the relevance and competence of that testimony, (4) that the witness could probably be obtained if the continuance were granted, and (5) that the party seeking the continuance has exercised due diligence in trying to locate the witness"). Mr. Cox has not relied on cases such as *Bedney* to argue that the considerations listed in *Bedney* must be treated as mandatory requirements. Instead, Mr. Cox has agreed with the United States that this court should review the trial court's ruling in this case based on a weighing of the factors listed in *Askew*. We therefore need not and do not decide the question whether there are certain mandatory prerequisites before a trial court may permissibly grant a motion to continue for a party to obtain evidence. *See, e.g.*, *Rose v. United States*, 629 A.2d 526, 535 (D.C. 1993) ("It is a basic principle of appellate jurisprudence that points not urged on appeal are deemed to be waived.").

Mr. Cox argues that several of the pertinent factors weigh in his favor, including (1) the United States and CSOSA lacked diligence because they could have already obtained the additional evidence from Wisconsin as to whether Mr. Cox's conduct underlying his Wisconsin conviction involved threats or force of threats; (2) the government failed to articulate any prejudice it would have suffered had a continuance been denied; (3) the government did not establish a likelihood that it would obtain probative evidence if the court granted the continuance; and (4) the continuance prejudiced Mr. Cox.

We agree with Mr. Cox that the first factor—lack of diligence—weighs in Mr. Cox's favor. As Mr. Cox notes, CSOSA and the United States could presumably have obtained the information at issue earlier, and they provided no specific reason for their failure to have tried to do so.

We view the second factor—prejudice to the party seeking the continuance—as favoring the United States. The upshot of the discussion on the initial hearing date was that there might be additional evidence that would help the trial court more accurately determine whether Mr. Cox was or was not properly required to register as a sex offender in the District. The court also was reluctant to rule on an incomplete record because it was concerned that such a ruling might preclude the United States from later seeking to require Mr. Cox to register based on more complete information. A ruling by the trial court on an incomplete record would have posed

a risk of an inaccurate decision that could be prejudicial to the public and to the United States as a representative of the public interest. *See generally, e.g.*, *Daley v. United States*, 739 A.2d 814, 818 (D.C. 1999) (treating inability to obtain potentially exculpatory evidence as prejudice for purposes of reviewing trial-court order denying continuance). As this court has emphasized, "SORA was adopted to protect the public, and especially minors, from the threat of recidivism posed by sex offenders who have been released into the community." *In re Doe ("S.D.")*, 855 A.2d 1100, 1102 (D.C. 2004). SORA is "designed to promote public safety in at least three ways: by facilitating effective law enforcement; by enabling members of the public to take direct measures of a lawful nature for the protection of themselves and their families; and by reducing registered offenders' exposure to temptation to commit more offenses." *In re W.M.*, 851 A.2d at 441 (internal quotation marks omitted).

We view the third factor—the likelihood that probative information would be obtained—as weighing somewhat against the United States because the United States was unable to provide any assurance that in fact additional information could be obtained. On the other hand, we do not view it as unreasonable for the trial court to have granted the United States additional time to determine whether the Wisconsin courts or the Wisconsin prosecutor had retained additional highly relevant information.

Turning to the question of prejudice to Mr. Cox (and leaving aside for the moment SORA's statutory deadline), we are not persuaded that Mr. Cox suffered unfair prejudice as a result of the continuance that would warrant reversal. First, Mr. Cox refers in a footnote to a comment Mr. Cox's counsel made to the trial court that a delay could have a negative impact on Mr. Cox's ability to apply for veteran's benefits and "other things." We do not view the possible impact of a delay that ended up being approximately five weeks as substantial prejudice of the kind that would warrant reversal of the trial court's discretionary ruling granting a continuance, particularly given that the trial court ultimately determined that Mr. Cox was in fact required to register as a sex offender.

Mr. Cox also argues that he was prejudiced because the continuance allowed the United States to obtain additional evidence that changed the outcome of the proceeding. Continuances, however, are often granted because a party hopes to obtain evidence that might affect the outcome of the proceeding. We do not understand that possible consequence of a continuance in and of itself to be unfairly prejudicial to the party opposing the continuance. *Cf., e.g.*, *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977) ("Of course, 'unfair prejudice' as used in [Fed. R. Evid.] 403 is not to be equated with testimony simply adverse to the opposing party. . . . The prejudice must be 'unfair.'").

Although Mr. Cox characterizes the trial court's ruling as unfairly giving the United States a "second bite at the apple," we do not agree with that characterization. The trial court did not rule on the initial hearing date, instead continuing the hearing and allowing the United States time to obtain additional evidence. To extend the apple-eating metaphor, the trial court gave the United States additional time to finish its first bite of the apple.

Mr. Cox also argues that the continuance was unfairly prejudicial because the trial court provided the United States with a "blueprint" for proving its case. We also do not agree with that characterization of the trial court's conduct. Rather than providing a "blueprint" of how the United States should prove its case, the trial court asked whether a record of the plea proceedings in Wisconsin was available and raised the possibility of giving the United States time to try to obtain that record.

For the foregoing reasons, we are not persuaded that Mr. Cox suffered substantial unfair prejudice warranting reversal as a result of the trial court's granting of the continuance. With respect to other relevant factors, we note that the continuance was relatively brief and that there is no suggestion that the United States acted in bad faith.

In our view, the trial court in this case could permissibly have denied the request for a continuance. As we have noted, however, our review of trial-court continuance rulings is highly deferential. In fact, we have not located any case in

which this court has reversed a trial-court order granting a continuance. Mr. Cox does cite a few decisions from around the country in which appellate courts have reversed trial-court orders granting continuances. Those cases, however, involve pretrial continuances in criminal or juvenile-delinquency cases, which raise special concerns about the defendant's or respondent's constitutional (and in some jurisdictions statutory) right to a speedy trial. *See, e.g.*, *People v. Shannon*, 340 N.E.2d 129, 130-32 (Ill. App. Ct. 1975) (trial-court order granting continuance violated defendant's right to speedy trial). Moreover, some of those decisions appear to treat lack of diligence as flatly requiring denial of a continuance request, which is contrary to the multi-factor balancing approach that we articulated and applied in cases such as *Askew* and *Gilliam* and that the parties agree we should apply in this case. *See, e.g.*, *State v. Adamski*, 761 P.2d 621, 623 (Wash. 1988) (interpreting court rule to require diligence). We also note that there are cases from other jurisdictions either (1) upholding orders granting a continuance to provide additional evidence despite the absence of a finding of diligence, *see, e.g.*, *Rain & Hail, L.L.C. v. Davis*, 165 So. 3d 1204, 1209 (La. Ct. App. 2015) (trial court considering summary-judgment motion noted deficiencies in evidence provided by both parties, granted defense motion to continue, and gave both parties opportunity to provide additional evidence); or (2) reversing a trial-court order denying a continuance to obtain evidence, even in the absence of diligence by the requesting party, *see, e.g.*, *United States v. Ellis*, 263 F. App'x 286, 289-90 (4th Cir. 2008) (reversing denial of

defendant's motion to continue; even assuming that defense counsel was not diligent, other factors favored granting of continuance).

In sum, weighing all of the applicable factors, we hold that the trial court acted within its broad discretion in granting a continuance.

### C. SORA Deadline

Mr. Cox argues that the trial court committed reversible error by violating SORA's requirement that the court rule on Mr. Cox's motion within sixty days of the filing of the motion. Although the trial court did not comply with that deadline, we hold that the trial court's failure to do so was not reversible error.

Mr. Cox's motion was filed on March 13, 2019. SORA required a ruling within sixty days. D.C. Code § 22-4004(a)(2)(B). The trial court nevertheless set a hearing for June 21, 2019, which was about five weeks beyond SORA's deadline. The trial court then ruled on July 31, 2019, approximately five additional weeks beyond SORA's deadline.

Mr. Cox arguably forfeited any objection to the trial court's failure to rule on the motion within sixty days. As previously noted, Mr. Cox did not object to the trial court's setting of a hearing on the motion for June 21, 2019, even though that date was beyond SORA's sixty-day deadline for the court to rule on the motion. The United States, however, has not argued that Mr. Cox forfeited this argument. This

court does not normally consider arguments that the parties have not raised. *See, e.g., Rose*, 629 A.2d at 535-36 (principle that points not argued on appeal are deemed waived "applies to the government no less than to the defendant in a criminal case. . . . Courts generally decline to consider arguments thus waived—even where the waived point might arguably have led to affirmance of the conviction.") (footnote omitted). We see no extraordinary circumstances that should lead this court to consider an issue of forfeiture that the United States did not raise. We therefore address Mr. Cox's argument on the merits.

Some statutory deadlines for court action are jurisdictional and flatly preclude the court from acting outside the deadline. *See, e.g., McIntosh v. United States*, 601 U.S. 330, 337 (2024) ("If the court misses a jurisdictional deadline, it is completely powerless to take any relevant action, and the parties cannot waive the deadline.") (internal quotation marks omitted). Such deadlines are "rare." *Id.* Mr. Cox does not contend that SORA's sixty-day deadline is jurisdictional in character. We agree that SORA's deadline is not jurisdictional. Although SORA provides that the trial court "shall" rule on the motion within sixty days, D.C. Code § 22-4004(a)(2)(B), SORA "does not expressly refer to subject-matter jurisdiction or speak in jurisdictional terms," *McIntosh*, 601 U.S. at 337 (internal quotation marks omitted).

A statutory deadline for court action may be non-jurisdictional but still mandatory. *See McIntosh*, 601 U.S. at 337. "If the affected party alerts the court to

[such a] deadline and invokes its protection, the relevant action cannot be taken after the deadline has passed." *Id.* "Unlike jurisdictional limits, though, mandatory [deadlines] are subject to waiver and forfeiture by a litigant." *Id.* Mr. Cox does not argue that SORA's statutory deadline is mandatory in this sense. We agree that SORA's deadline is not mandatory. We have held that statutory deadlines for court (or other official) action are presumptively not mandatory if the statute "imposes a time limit within which a public official must act but does not specify the consequences of noncompliance." *Holzsager v. D.C. Alcoholic Beverage Control Bd.*, 979 A.2d 52, 61 (D.C. 2009) (brackets, ellipsis, and internal quotation marks omitted); *see also McIntosh*, 601 U.S. at 338-40 (where statutory deadline for official action does not specify consequence for noncompliance, courts will not ordinarily interpret deadline as precluding official action after deadline). SORA does not impose any consequence if the court misses the deadline for ruling on a motion seeking review of a CSOSA determination. D.C. Code § 22-4004(a)(2)(B). Nor do we see any other consideration tending to rebut the presumption we recognized in *Holzsager*. We therefore hold that SORA's statutory deadline is not mandatory in the sense of precluding the trial court from ruling on the motion if the court misses the deadline.

Statutory deadlines for court action that are neither jurisdictional nor mandatory are referred to as "directory" in character, or as "time-related

directive[s]." *Holzsager*, 979 A.2d at 61; *McIntosh*, 601 U.S. at 338 (time-related directives "function[] as a spur to prompt action, not as a bar to tardy completion of business") (ellipsis and internal quotation marks omitted). The parties appear to agree that whether the failure to comply with such a deadline requires the overturning of a belated judicial action depends on a balancing of the prejudice to the party complaining of the delay against the interest in allowing the court to resolve the matter before the court on the merits. *Cf., e.g.*, *Brown v. D.C. Pub. Emp. Rels. Bd.*, 19 A.3d 351, 357 (D.C. 2011) (when agency fails to render decision within directory deadline, court will conduct balancing test "to determine whether the agency's delay caused sufficient prejudice . . . to outweigh the normally prevailing interest in allowing the agency to act after the expiration of the time limit").

The trial court in this case did not explicitly conduct such a balancing, but neither party has objected on that ground or sought a remand to the trial court. Nor has either party suggested that the necessary balancing turns on unresolved matters of fact. We therefore conduct that balancing ourselves. Relatedly, neither party has explicitly taken a position as to who bears the burden of persuading the court as to the proper balancing of the relevant considerations. We assume without deciding that the United States, as the party that benefitted from the delay, bears that burden in this case.

We hold that any prejudice to Mr. Cox from the ten-week delay in this case did not outweigh the "normally prevailing interest in allowing" the trial court to act after the statutory deadline. *Brown*, 19 A.3d at 357. For the reasons previously noted, there was a substantial public interest in permitting the trial court to accurately determine whether Mr. Cox was required to register for life as a sex offender in the District.

This case is in a peculiar posture, however, because the trial court had already missed the statutory deadline at the time of the initial hearing. Mr. Cox did not argue in the trial court, and does not argue here, that the trial court ought to have been flatly foreclosed from ruling on the motion because the deadline had been missed. Rather, Mr. Cox's argument has been that in light of the deadline, the trial court ought to have ruled based on the record at the initial hearing. We assume, because the United States has not argued otherwise, that the trial court's decision to continue the hearing rather than rule on the record as it existed on the initial hearing date is also subject to *Brown*'s balancing test, even though the statutory deadline had already run at the time of the trial court's continuance ruling. Even on that assumption, however, we conclude that there was a substantial public interest in an accurate determination as to whether Mr. Cox was required to register as a sex offender.

Against that substantial public interest, we must weigh any prejudice that Mr. Cox suffered. Mr. Cox claims that he was prejudiced in two ways. First,

Mr. Cox argues that the continuance unfairly gave the United States a "second bite at the apple." We have already explained our reason for being unpersuaded by that argument. *See supra* at 17.

Second, Mr. Cox argues that the delay was prejudicial to him because the trial court would have ruled for Mr. Cox based on the record as it existed at the time of the initial hearing, whereas the trial court eventually ruled against Mr. Cox based on the fuller record created at the continued hearing. It is unclear that simply reaching a different decision based on a fuller factual record is a kind of prejudice that favors Mr. Cox in the balancing of interests. When considering whether the missing of a statutory deadline caused prejudice to the objecting party, we have focused on whether the delay "impair[ed] the fairness of proceedings or the correctness of the action taken" or adversely affected the objecting party's "ability to contest" the decision. *Anjuwan v. D.C. Dep't of Pub. Works*, 729 A.2d 883, 886 (D.C. 1998) (internal quotation marks omitted). We have not treated the opposing party's opportunity to create a fuller evidentiary record as in itself a form of unfair prejudice supporting reversal.

Mr. Cox argues, however, that reversal is always required if the trial court's failure to adhere to a directory deadline changes the outcome of the proceeding. We disagree. Mr. Cox's argument seems incompatible with the principle, which Mr. Cox acknowledges, that when the trial court fails to render a decision within a

directory deadline, this court will conduct a balancing "to determine whether the [court's] delay caused sufficient prejudice . . . to outweigh the normally prevailing interest in allowing the [court] to act after the expiration of the time limit." *Brown*, 19 A.3d at 357. Thus, even if simply causing a change in the outcome were a cognizable form of prejudice to be considered in the balancing, the question would remain whether that prejudice outweighed the "normally prevailing interest" in allowing the court to act after the deadline. *Id.*

In support of the argument that reversal is required whenever the failure to meet a statutory deadline causes a change in the outcome, Mr. Cox relies primarily on two cases: *Scholtz Partnership v. D.C. Rental Accommodations Commission*, 427 A.2d 905 (D.C. 1981), and *United States v. Montalvo-Murillo*, 495 U.S. 711 (1990). We do not view either case as establishing such a requirement in the circumstances of this case. In *Scholtz*, the agency failed to meet a directory deadline for ruling on a petition, and the applicable law changed after the deadline but before the agency ruled. 427 A.2d at 917. We held that the petitioner had a "vested" right to application of the law as it existed at the time the statutory deadline ran. *Id.* That legal holding was not based on a discussion of the nature of the statutory deadline or an application of the balancing test that applies to determine whether reversal is required when an agency acts outside of directory statutory deadlines. *Id.* We also did not suggest in *Scholtz* that parties have a vested right to the factual record that

exists at the time of an initial hearing held after a directory deadline has already run, as opposed to a fuller record created at a continued hearing. *Id.* Nor did we suggest that creation of a fuller factual record after a statutory deadline has already passed is a form of prejudice, much less that reversal is required whenever the creation of such a record changed (or may have changed) the outcome of the proceeding. In sum, we do not view *Scholtz* as contrary to our ruling in this case or as establishing a flat rule contrary to the balancing test that this court has applied in cases such as *Brown.*

In *Montalvo-Murillo*, the Supreme Court took as a given that the trial court had held a pretrial detention hearing after the statutory deadline. 495 U.S. at 714-16. The question was whether the missing of that deadline required that the defendant be released. *Id.* at 717. The Court held that release was not required. *Id.* at 717-22. The Court emphasized "the great principle of public policy . . . which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided." *Id.* at 718 (internal quotation marks omitted). The Court explained that pretrial detention, where warranted, was intended to "protect[] the safety of the public and assur[e] the appearance at trial of defendants found likely to flee." *Id.* at 720. The Court concluded that "there [was] no reason to bestow upon the defendant a windfall and to visit upon the Government and the citizens a severe penalty by mandating release of possibly dangerous defendants" based on the failure to observe the statutory deadline. *Id.*

Thus far, the reasoning and outcome of *Montalvo-Murillo* seem to strongly support rather than undermine our holding in this case. Mr. Cox relies, however, on the Supreme Court's observation that its holding was "consistent with" harmless-error principles. 495 U.S. at 722. As the Court explained, the failure to comply with the deadline for the detention hearing did not have a "substantial influence on the outcome of the proceeding," because Mr. Montalvo-Murillo would have been detained if the detention hearing had been held within the statutory deadline. *Id.* For two reasons, however, we do not view this observation in *Montalvo-Murillo* as warranting reversal in the present case. First, the Court in *Montalvo-Murillo* simply noted that the missing of the deadline in that case did not affect the outcome of the proceeding. *Id.* The Court did not hold that reversal is required anytime the missing of a directory statutory deadline changed or might have changed the outcome of the proceeding. Second, this court has not analyzed the failure to adhere to a directory statutory deadline under harmless-error principles, which generally do require reversal if the error affected the outcome of the proceeding. *See generally, e.g.*, *Castillo v. United States*, 75 A.3d 157, 166 (D.C. 2013) (To be harmless, an "error must be so inconsequential that it made no appreciable difference to the outcome.") (internal quotation marks omitted). Rather, we apply a much more flexible approach to trial-court rulings made outside of directory statutory deadlines, reversing only if the failure to comply with the deadline "caused sufficient prejudice . . . to outweigh the normally prevailing interest in allowing the [court] to act after the expiration of

the time limit." *Brown*, 19 A.3d at 357. For the reasons we have explained, we conclude that reversal is not warranted in this case under that balancing.

## D. Sufficiency of the Evidence

Finally, Mr. Cox argues that the evidence was insufficient to support the trial court's finding by a preponderance of the evidence that Mr. Cox's Wisconsin offense involved the use or threatened use of force. In defending the trial court's ruling, the United States focuses solely on the actual use of force. We hold that the evidence permitted the trial court reasonably to conclude by a preponderance of the evidence that Mr. Cox used force to sexually assault the complaining witness in the Wisconsin case.

### 1. Standard of review

The general principles governing our review of sufficiency-of-the-evidence claims are well settled. Our review "is deferential, giving full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Rahman v. United States*, 208 A.3d 734, 738 (D.C. 2019) (internal quotation marks omitted). We assess a trial court's factual conclusions to determine whether those conclusions are clearly erroneous. *Mingle v. Oak St. Apts. Ltd.*, 249 A.3d 413, 415 (D.C. 2021). We may not reverse a trial court's factual finding unless the finding is

"plainly wrong or without evidence to support it." *Id.* (quoting D.C. Code § 17-305)). We must defer to the trial court's judgment "[w]here facts are reasonably susceptible to more than one interpretation." *Id.* "The evidence on which the trial court relies must not be so slight or insufficient as to fail to rationally support a finding upon the appropriate standard of proof." *Id.* Whether the evidence is sufficient to support a trial court's finding is an issue of law that we determine de novo. *E.g.*, *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1252 n.53 (D.C. 2016).

Mr. Cox argues, however, that this court owes little or no deference to the trial court's factual finding in this case, because the trial court made that finding based on documents rather than live testimony. *See, e.g.*, *Lopez v. United States*, 863 A.2d 852, 861 (D.C. 2004) ("While we defer to those findings that are directly related to the judge's presence in the courtroom, findings based on documents or other writings do not merit nearly as much deference, if any at all."). Both the Supreme Court and this court, however, have explicitly rejected the theory that the clear-error standard applies only to factual findings that rest on the factfinder's assessment of the credibility of live testimony. *See Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) (Fed. R. Civ. P. 52(a) "does not make exceptions or purport to exclude certain factual findings from the obligation of the court of appeals to accept a district court's findings unless clearly erroneous") (internal quotation marks omitted); *Am. Sec. Bank, N.A. v. Am. Motorists Ins. Co.*, 538 A.2d 736, 739 (D.C. 1988) (holding

that prior "uncertainty" about standard of appellate review of factual findings based on documentary evidence "has been resolved" by amendment to D.C. Super. Ct. Civ. R. 52(a), providing that "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous"); *see generally* D.C. Code § 17-305(a) (in case that was not tried to jury, court of appeals "may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless the judgment is plainly wrong or without evidence to support it"); *Ward-Minor v. United States*, 316 A.3d 438, 445 (D.C. 2024) (clear-error standard applies to trial-court findings based on review of body-worn camera footage, even though court of appeals can also view that footage; court of appeals will find clear error when review of entire record leaves court of appeals with "definite and firm conviction that a mistake has been made") (internal quotation marks omitted).

This court has outlined the reasons for applying the clear-error rule to all factual determinations made by the trial court, even those that rest on review of documents rather than live testimony:

> The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. As the [Supreme] Court has stated

> in a different context, the trial on the merits should be the
> main event rather than a tryout on the road.

*Am. Sec. Bank*, 538 A.2d at 740 (quoting *Anderson* 470 U.S. at 574-75) (ellipses and internal quotation marks omitted). *See also id.* ("To permit courts of appeals to share more actively in the fact-finding function would tend to undermine the legitimacy of the [trial] courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.") (internal quotation marks omitted).

## 2. Analysis

For the foregoing reasons, we "look only at whether the trial court's findings, although based on documentary evidence, were clearly erroneous." *Am. Sec. Bank*, 538 A.2d at 740. We find no clear error. To the contrary, the record before the trial court sufficed to support the trial court's finding that the Wisconsin offense involved the use of force. As previously noted: (1) the complaining witness testified in detail under oath that Mr. Cox used force to sexually assault her; (2) the sentencing judge reviewed medical records that the sentencing judge concluded reflected injuries that were largely consistent with the complaining witness's testimony; and (3) Mr. Cox acknowledged at sentencing that he had a problem with anger, that his anger "came out" during the incident at issue, that he "did break the law as far as fighting" the

complaining witness, but that he was "learning to control the violence." *Supra* at 5-7.

In arguing that the evidence was insufficient, Mr. Cox accurately identifies a number of weaknesses in or limitations of the evidence: (1) his plea was an *Alford* plea and thus he did not admit as part of his plea that he forcibly sexually assaulted the complaining witness; (2) the trial court was ruling based on a cold record rather than live witness testimony; (3) the cross-examination of the complaining witness at the preliminary hearing in Wisconsin was limited; (4) the underlying medical records were not before the trial court; (5) the sentencing judge expressed doubt that Mr. Cox had used a baseball bat violently against the complaining witness; and (6) Mr. Cox's statement about fighting was ambiguous and could have referred to a verbal rather than physical altercation.

The trial court carefully addressed both the strengths and the weaknesses of the evidence. We conclude, essentially for the reasons stated by the trial court, that the evidence adequately supported a conclusion that Mr. Cox's Wisconsin conviction involved the use of force.

Only one of Mr. Cox's points requires further discussion. Mr. Cox suggests that the trial court could not permissibly make a factual determination as to whether the Wisconsin offense involved force without hearing live testimony. We disagree.

Mr. Cox did not argue in the trial court, and he does not argue in this court, that the evidence relied upon by the trial court was inadmissible. It is true that the evidence was documentary, and thus had the form of hearsay, rather than live testimony, but it is well settled that a factfinder may consider "[u]nobjected-to hearsay." *E.g.*, *Ross v. Blackwell*, 146 A.3d 385, 389 (D.C. 2016). In any event, SORA expressly provides for consideration of the types of evidence that the trial court relied upon in this case. D.C. Code § 22-4004(c)(1) (trial court "may, in its sole discretion, decide a motion [challenging CSOSA's determination that a person must register as a sex offender] on the basis of the motion, affidavits, the files and records of the case, other written documents, proffers of the parties, or an evidentiary hearing").

Nor did the absence of live testimony preclude the trial court from finding by a preponderance of the evidence that Mr. Cox's Wisconsin conviction involved the use of force. To the contrary, this court has held that a factfinder may in appropriate circumstances rely on hearsay evidence even in the face of contrary live testimony (which Mr. Cox elected not to provide in this case). *See, e.g.*, *Compton v. D.C. Bd. of Psych.*, 858 A.2d 470, 478 (D.C. 2004) ("[W]e have previously rejected attempts to invalidate agency findings mechanically for a lack of substantial evidence simply because the finding was based on hearsay evidence contradicted by sworn testimony.") (internal quotation marks omitted).

In support of his argument that live testimony was required, Mr. Cox cites *W.M.*, 851 A.2d at 455-56, and *Samuels v. United States*, 435 A.2d 392, 395 (D.C. 1981). We do not view either case as supporting Mr. Cox's argument. In *W.M.*, CSOSA determined that the appellant at issue (W.B.) had committed an offense that involved force and that W.B. therefore was properly required to register as a sex offender. *W.M.*, 851 A.2d at 452. W.B. filed an affidavit denying that the offense involved the use of force, but the trial court ruled against W.B. without holding a hearing. *Id.* In *Samuels*, the defendant filed a motion alleging that his counsel was ineffective in failing to note an appeal, and there was a factual dispute as to whether the defendant had asked counsel to note an appeal. *Samuels*, 435 A.2d at 395. The trial court denied the motion without holding any hearing. *Id.*; *see also* D.C. Code § 23-110(c) (trial court "shall" grant hearing on motion to vacate sentence unless record "conclusively show[s] that the prisoner is entitled to no relief"). In both *W.M.* and *Samuels*, the trial court resolved factual matters without conducting a hearing, and this court indicated that a hearing was or likely would be necessary. *W.M.*, 851 A.2d at 455-56; *Samuels*, 435 A.2d at 395.

In contrast, the trial court in this case held two hearings at which Mr. Cox was free to introduce whatever appropriate evidence he wished to introduce. Mr. Cox chose not to testify or otherwise introduce evidence, a decision that Mr. Cox was of course entirely free to make. Moreover, Mr. Cox did not attempt in the trial court to

obtain live testimony from the complaining witness. Mr. Cox was not required to take that step either, and we acknowledge that the burden of proof here was on the United States. But we see no error in the trial court's decision to resolve the case based on the information that the parties had provided, even if that information did not include live testimony from either the complaining witness or Mr. Cox. We note that there are numerous cases in which trial courts around the country have resolved similar factual disputes in the absence of live testimony. *See, e.g.*, *People v. Diaz*, 145 N.E.3d 947, 948 (N.Y. 2020) (mem. op.) ("SORA adjudications, by design, are typically based on documentary evidence under the statute's reliable hearsay standard. Case summaries and [presentence investigation reports] meet that standard, meaning they can provide sufficient evidence . . . .") (internal quotation marks omitted).

For the foregoing reasons, we affirm the judgment of the Superior Court.

*So ordered.*